UNITED STATES, Appellee,

v.

**Jose M. CASTILLO, a/k/a Richard Lara, a/k/a Daniel, Defendant, Appellant.**

No. 01–1010.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 2001.

Decided April 19, 2002.

Robert F. Muse for appellant.

William D. Weinreb, Assistant United States Attorney, with whom James B. Farmer, United States Attorney, and Rachel E. Hershfang, Assistant United States Attorney, were on brief for appellee.

Before SELYA and LIPEZ, Circuit Judges, and SINGAL, District Judge.*

LIPEZ, Circuit Judge.

Defendant–Appellant José Castillo appeals from the district court's denial of his request for a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Castillo alleges and hopes to establish that the magistrate judge relied on an affidavit that omitted facts material to a probable cause determination underlying the issuance of a search warrant. Disagreeing with that contention, we affirm.

## I

On May 25, 1999, Lawrence police officers applied for a warrant to search the second floor apartment at 214 High Street in Lawrence, Massachusetts. Police detective Mark Rivet supported that application with an affidavit describing the following events, which also occurred on May 25, 1999 (we summarize his description):

* Of the District of Maine, sitting by designation.

1) Lawrence police arrested Rafaella Rosario at her residence, the first floor of 38 Exeter Street in Lawrence. Rosario waived her *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and signed a Drug Enforcement Administration consent to search form. Agents and officers seized one-half kilogram of a substance she admitted was cocaine, and fifty grams of a substance which she admitted was heroin.

2) Rosario told the agents and officers that she was holding the drugs for Ramon Alcantara. Rosario also gave the officers other leads concerning drug dealers in the area. Pertinently, she stated that she knew that approximately 125 grams of heroin were being stored in the basement of 214 High Street on a beam. She also stated that Alcantara's residence, the second floor of 214 High Street, contained triple the amount of drugs seized at her residence. She stated that Alcantara lived in this apartment with an individual she described as "Indian-looking" and a man known to her as Daniel.[1] She also said that Alcantara was driving a green car.

3) Rosario placed a call to Alcantara to order 125 grams of heroin. Agents and officers established surveillance at 214 High Street, where they observed a green car in front of the building. They then observed two men exit 214 High Street and enter the green vehicle. They approached the green vehicle and asked the men for identification. On the basis of Florida drivers' licenses, they were identified as Juan Castillo and Felix Santana. The men told the officers they were coming from the first floor apartment, where they lived. However, when both men were brought to the door of the first floor apartment, its tenant said that he did not know them, and that they were staying with

1. José Castillo, the appellant, used the aliases Richard Lara and Daniel.

Alcantara on the second floor. The resident of the first floor apartment permitted the agents to search the common basement.

The affidavit then described what occurred as the officers searched the basement:

[A]gents and officers found a clear plastic baggie on top of a beam in the basement. The baggie contained a substance that was consistent with the appearance of heroin. While the consent search of the basement was being conducted, agents and officers observed two Hispanic males run from the second floor apartment. There is only one apartment on the second floor. Both men were apprehended and were subsequently identified as Ramon Alcantara Jiminez and Richard Lara [an alias of José Castillo].[2]

Detective Rivet's affidavit concluded with his assertion that there was probable cause to believe that "there is currently located within 214 High Street, second floor, Lawrence, Massachusetts, illegal controlled substances...."

There were a number of agents and officers at 214 High Street. One of them, Drug Enforcement Administration Special Agent Todd Prough, found the baggie on the beam. In an affidavit submitted in response to Castillo's motion for a *Franks* hearing, he stated that he did not have a field-test kit available to test the substance in the baggie, but told Rivet that it contained "a white powder with an appearance consistent with that of heroin." Prough stated that, after he gave Rivet this information, he remained at 214 High Street until he was relieved by Trooper Brian O'Neil. He then went to the police station

to perform several tests related to the investigation, including testing the baggie to see whether it actually contained heroin. When he left for the station to test the baggie, he was told by another officer that Detective Rivet was already en route to swear out the application for a search warrant. A test at the police station revealed that the baggie did not contain heroin. Prough returned to 214 High Street after receiving this information. By the time he arrived, Detective Rivet and other officers had almost completed their search of the second floor apartment pursuant to a warrant issued by a magistrate on the basis of Rivet's affidavit. That search was executed at 9:15 P.M.

The next day, Drug Enforcement Administration Special Agent Gregg A. Willoughby stated in an affidavit in support of a criminal complaint that while the baggie on the beam tested negative for the presence of heroin and cocaine, the subsequent search of the second floor apartment at 214 High Street revealed many substances that field tested positive for heroin.

On July 1, 1999, the grand jury returned an indictment charging Castillo and codefendant Ramon Alcantara with conspiracy to distribute and possess with intent to distribute heroin and cocaine (Count I).[3] On October 12, 1999, Castillo filed a Motion for *Franks* Hearing and to Suppress Evidence. The district court denied that motion on January 26, 2000. Castillo pleaded guilty to the conspiracy count on April 10, 2000. On November 20, 2000, the district court imposed a sentence of 70 months of imprisonment. The Plea Agreement permitted Castillo to appeal the district court's denial of his motion for a *Franks* hearing. Castillo filed a notice of

---

**2.** Two other men were also apprehended at the scene: Felix Santana and Juan Castillo, the men in the green car.

**3.** The grand jury only indicted Alcantara for Count II (possession with intent to distribute heroin and cocaine).

appeal after judgment was entered on November 29, 2000.

## II.

Castillo argues that there is an inconsistency between Rivet's search warrant affidavit alleging that the "baggie [found in the basement at 214 High Street] contained a substance that was consistent with the appearance of heroin," and Willoughby's criminal complaint affidavit filed the next day admitting that the "white, powdery substance ... subsequently tested negative for the presence of heroin and cocaine." On the basis of this alleged inconsistency, he speculates that "when application was made for the search warrant, the DEA and/or Lawrence Police knew that the baggie found on the basement beam had field tested negative for heroin and cocaine." Castillo also charges that the government should have admitted in its affidavit that "the two Hispanic males running from the second floor apartment did not run until after police broke down the door to the apartment." He claims that these two omissions entitled him to a *Franks* hearing at which he could try to demonstrate that, with full disclosure, there was no probable cause for the issuance of a warrant on May 25, 1999.

■ The Supreme Court has held that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of

probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674. A material omission of information may also trigger a *Franks* hearing. *United States v. Hadfield*, 918 F.2d 987, 992 (1st Cir.1990). Therefore, we consider whether Castillo has made "a substantial preliminary showing" that the two omissions he identifies were "made knowingly and intentionally" or "with reckless disregard for the truth" and whether the omissions were "necessary to the finding of probable cause."[4] *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674. "We review the denial of [a *Franks* ] hearing for clear error." *United States v. Grant*, 218 F.3d 72, 76 (1st Cir. 2000) (citing *United States v. Owens*, 167 F.3d 739, 747 (1st Cir.1999)). A district court's ruling is clearly erroneous only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### A. Intentional or Reckless Omissions

#### 1. The Baggie

■ The government argues that Rivet's potentially misleading characterization of the contents of the baggie resulted only from Prough's inability to test the baggie at the scene before Rivet swore out his affidavit. Castillo disagrees, arguing that Detective Rivet knew that the substance he described in the affidavit as "consistent with the appearance of heroin" had tested negative for the presence of heroin and

---

4. We note an important difference between the "necessary" inquiries when the challenge is to the omission of an allegedly material fact rather than to the inclusion of an allegedly false material statement. With an omission, the inquiry is whether its inclusion in an affidavit would have led to a *negative* finding by the magistrate on probable cause. If a false statement is in the affidavit, the inquiry is whether its inclusion was necessary for a *positive* finding by the magistrate on probable cause.

cocaine. Castillo does not believe that Prough "just didn't get around to performing the field test until late that evening" because, he argues, "[Prough] knew that a positive field test would clinch probable cause." Castillo claims that this allegation calls into question the government's account of the timing of the negative field test, entitling him to a hearing.

Castillo offers no evidence to support his speculation that the negative field test had already been performed by Prough when Rivet prepared his affidavit. According to the government, "the uncontroverted evidence demonstrates that Agent Prough remained at 214 High Street with the baggie … until relieved by a state trooper; by that time, he had learned that Detective Rivet was on his way to swear out the affidavit. Agent Prough went from 214 High Street to the North Andover police station (a trip of some 10–15 minutes duration), where the field test was his last task; then he returned to 214 High Street immediately, arriving some 10 or 15 minutes later, to find the search underway and nearly complete." In the face of this uncontroverted evidence, Castillo's speculation about the timing of the testing of the baggie falls far short of the "substantial preliminary showing" of intentional or reckless omission required by the *Franks* test.

**2. The Flight**

■ Castillo has also failed to offer any evidence that Detective Rivet intentionally or recklessly failed to note that Castillo only ran from the apartment after the police broke down the door. To the extent

that he asks us to draw the inference of an intentional or reckless omission on the basis of the possible motive of Rivet to protect a close probable cause showing, we reject that inference. As we indicate below, the inclusion of this apparently innocent omission about all the circumstances of the flight would not have threatened a finding of probable cause. Indeed, it would have strengthened the probable cause showing.[5]

**B. Omissions Immaterial to a Finding of Probable Cause**

**1. The Baggie**

■ Here we assess "whether, even had the omitted statements been included in the affidavit, there was still probable cause to issue the warrant." *United States v. Rumney*, 867 F.2d 714, 720 (1st Cir.1989). A court issuing a search warrant must examine the "totality of the circumstances" to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Castillo argues that "the only event or observation directly purporting to involve drugs was the discovery of the baggie in the basement," and that the magistrate judge would have had no reason to find probable cause if he had known that the baggie tested negative for heroin. This assertion ignores important details provided by the informant Rosario which were soon confirmed by the surveillance at 214 High Street. It also ignores inculpatory conduct by the suspects at the scene.[6]

---

**5.** Although we could end our analysis with the intentional or reckless inquiry, Castillo's suggestion that Rivet had a motive to omit material facts from his affidavit because of the closeness of the probable cause question connects the "state of mind" inquiry to the materiality inquiry. Therefore, for the sake of

completeness, we deem it appropriate to analyze the materiality prong.

**6.** We assume for the purpose of the materiality discussion that no inculpatory force attaches to the discovery of the baggie on the beam.

As reflected in Rivet's affidavit, Rosario told agents that the drugs they found in her apartment were from Ramon Alcantara, and that he "lived with a male known to her as Daniel and [an] Indian-looking male in the second floor apartment at 214 High Street, Lawrence, Massachusetts and that all three men dealt drugs." She also told agents that Alcantara drove a green car, and that he would be receiving 1,000 grams of heroin from two persons who had come from Miami the previous night. While some officers watched Rosario place a call to order 125 grams of heroin from Alcantara, others established surveillance at 214 High Street. Soon after the call was placed, they saw two males leave 214 High Street and enter a green vehicle in front of the building. Agents approached the vehicle and asked the males for identification; they showed Florida driver's licenses which indicated their names were Juan Castillo and Felix Santana. Juan Castillo looked like someone of Indian descent. They claimed to live on the first floor apartment, but when they were escorted there, the resident of the first floor apartment stated that neither man lived there. Instead, he said that the two men lived on the second floor with Ramon and Daniel (an alias for appellant Castillo), further confirming Rosario's statements. Moreover, these confirmed details about a green car, an Indian-looking male, and the residency of Ramon Alcantara in the second floor apartment with Daniel and the Indian-looking male, were all in the context of Rosario's call to Alcantara ordering 125 grams of heroin. Hence, the magistrate had an ample basis for a probable cause finding that would have been unaffected by a disclosure in Rivet's affidavit that the baggie in the basement field tested negative for heroin and cocaine.

**2. The Flight**

We are similarly unimpressed by the materiality of the omission that Castillo and Alcantara only ran from the second floor apartment after the police knocked down the door. Castillo's theory is that the disclosure of this additional fact to the magistrate would have undermined the inference of guilt from the flight in favor of an inference of fear. Underlying this theory is the premise that Castillo and Alcantara might have believed that the door was being knocked down by menacing strangers. Yet the government argues persuasively that this premise is untenable in light of all the surrounding circumstances: the police had surrounded the building before Castillo fled, had knocked on the door on two separate occasions, identifying themselves as police in both English and Spanish, and had arrested two persons in plain sight on the sidewalk below the apartment. If anything, the government says, the disclosure of all this detail in Rivet's affidavit would have strengthened, not weakened, the inference of guilt from flight. We agree. Again, there were no material omissions from the affidavit.

*Affirmed.*