US v. Lata                                    CR-03-224-JD  04/08/04

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

        v.                              Criminal No. 03-224-01-JD
                                        Opinion No. 2004 DNH 063
James T. Lata, Sr.


                        O R D E R


    Defendant James T. Lata, Sr., has moved to suppress
identification testimony, physical evidence, and statements he
allegedly made to a law enforcement officer from being used at
his upcoming trial for bank robbery.  Specifically, Lata contends
that (1) the out-of-court identification of him as the man who
held up a bank in Nashua, New Hampshire, on November 12, 2002,
was the product of an impermissibly suggestive photo array, (2)
the initial warrantless search of a van registered to him was
illegal, (3) the application for a warrant to conduct a further
search of the van was tainted by the warrantless search and
contained material omissions, rendering that stage of the search
illegal as well, (4) the subsequent application for a warrant to
search Lata's hotel room was tainted by the illegal searches of
the van, and (5) the May 8, 2003, telephone conversation between
Lata and Special Agent John Mulvaney was similarly tainted.  The
government objects to suppression in its entirety.

## Background

The court held an evidentiary hearing on March 26, 2004, on the sole issue of the admissibility of the identification testimony. The following findings are based on the testimony and exhibits received at the hearing and the materials submitted with the motion to suppress and the government's objection.

On November 12, 2002, Donna Debelis was working at the Citizens Bank branch at Trafalgar Square in Nashua when she noticed a man standing near the bank's customer service counter. After she approached him and identified herself as the assistant manager, the man asked to speak to Debelis in her office. Debelis described the man in her testimony as white, about 5'7" or 5'8" tall and 160 or 165 pounds, and close to 55 years old. She also recounted that the man's eyes "were blank, cold and steel-like." According to Debelis, the man was wearing a dark-colored zip-up jacket, a ski cap, and a bandaid across his nose.

After Debelis and the man entered her office, he produced a note stating in substance that he had a gun and a bomb and was robbing the bank. He then handed Debelis a black "leather-like" duffel bag and told her to get the money. She exited her office, went into the teller work area, and approached the two tellers handling the drive-through customers. Per instructions from Debelis, the tellers placed some cash into the duffel bag. Debelis then left the work area and returned the bag to the man,

2

who was pacing back and forth in front of the teller stations. The man said that the bag did not contain enough money and instructed her to hand him more through the teller windows.

Debelis re-entered the work area and obtained cash from two other tellers, Kathleen Gervais and Karen Leedberg, while the robber stood in front of Gervais's station and continued to demand more money from her. At the hearing, Gervais described the perpetrator as a white man with a reddish brown mustache and a ruddy complexion, wearing a black hat with a Nike logo and dark-colored coat. She also testified that estimating his age was difficult because of the hat. Leedberg testified that the robber was about 5'10" and 200 pounds, with a medium brown mustache. She described his attire as a dark blue coat of medium length, a wool hat, and a white piece of tape across the bridge of his nose. She also noticed that he was wearing black or dark blue high-top sneakers with a silver strip on the heel.

While Debelis was collecting money from Gervais and Leedberg, the perpetrator approached the station tended by another teller, Donna Whelan, and asked her to tell Debelis to hurry. Whelan left her station to give Debelis the message, returned to find the robber still standing there, locked her drawer, and retreated to the back of the teller area. She testified that the culprit was in his fifties and wore a dark-colored ski jacket and black hat with the Nike emblem. She did

3

not notice at the time of the robbery whether the man had facial hair. After receiving the additional cash, the robber left the bank. He had been there for between five and ten minutes.

Debelis subsequently reviewed a surveillance video of the robbery with responding officers from the Nashua Police Department. The black-and-white images from the video introduced by the government at the hearing show a middle-aged man with a dark mustache and wearing a dark-colored jacket and knit cap with a white Nike "swoosh" symbol standing in front of a teller station. None of the other Citizens employees who testified at the hearing have seen the video.

On November 15, 2002, Detective Thomas McLeod of the Nashua Police Department showed a photo array to Debelis, Gervais, and Whelan, as well as to the two drive-through tellers working at the time of the robbery. Debelis, Gervais, and Whelan all testified that they did not recognize anybody from among the photographs.[1]

When McLeod showed Debelis, Gervais, and Leedberg an array

---

[1]The defendant states in the body of his motion that both of the drive-through tellers picked a suspect out of this array with a degree of certainty of 8 out of 10. There was no evidence on this point received at the hearing or otherwise submitted with the motion, however, save for Gervais's testimony that one of the drive-through tellers told her that she thought the perpetrator had been depicted in one of the arrays.

4

comprised of photographs of different men on November 19, 2002, Gervais noted, with a certainty she described as a "low rating," that one of the people depicted "had similar features to the robber but the robber was not in these pictures." Leedberg told McLeod with regard to one of the men that his "eyes look familiar" and rated her certainty "about an eight" out of ten. Debelis still did not recognize anybody. In fact, no photograph of Lata had been included in the array.

A different branch of Citizens Bank in Nashua, at 227 Daniel Webster Highway, was robbed on March 14, 2003. Witnesses described the perpetrator as a white male between 5'7" and 5'9" tall, wearing prescription glasses, a dark-colored winter jacket, and a bandaid across the bridge of his nose and carrying a black duffel bag. After the robber exited the bank, a customer observed him getting into a white Ford van with a Florida license plate bearing the number H87BYL.[2] The customers followed the van until it pulled into the parking lot of a nearby restaurant. One of the restaurant's employees had previously noticed that the van had a license plate issued by Manatee County in Florida.

McLeod later relayed this information to the office of the Manatee County tax collector, who told him that license plate number H87BYD had been issued to a James Lata, born September 25,

---

[2]Another customer observed the first four digits of the plate numbers as H87B.

5

1942, for a white 1995 Ford Econoline van. The subsequent investigation of Lata revealed that he was 5'11" and 195 pounds and had been found in possession of $5,000 in $100 bills and a handgun while driving the van in April 2002. The subsequent investigation of the van revealed that a report of its theft had been made to the Ocean Springs, Mississippi, police department on April 17, 2003, by a James Lata. In the report, Lata had provided a description of the van consistent with that on file with the Manatee County tax collector and had given his address as the Villager Inn in Ocean Springs.

The Ocean Springs police soon learned that their counterparts in New Orleans had recovered a 1995 white Ford Econoline van bearing Florida license plate number H87BYD on April 28, 2003, and had it transported to a local repair shop. Captain Louis Miller of the Ocean Springs Police Department later examined the van, finding a navy blue medium-weight hooded jacket, a black duffle bag, and four or five pairs of prescription glasses inside.

On April 30, 2002, FBI Special Agent Wendell Cosenza obtained a warrant to search the van for evidence of a bank robbery. Cosenza's affidavit in support of the warrant contained the foregoing information about the March 14, 2003, bank robbery and the results of McLeod's investigation linking Lata to the van, including the information obtained from Manatee County, the

6

Ocean Springs police department, and the April 2002, stop of Lata while driving the van. The affidavit also mentioned the items which Miller had found inside the van and his report that Lata had paid $1,300 in cash for his room at the Villager.

When the FBI executed the warrant, they recovered the jacket and duffel bag from the van, as well as four empty eyeglass cases, a bandaid wrapper, a knit cap, and other items. Another FBI agent, Gerald D. Peralta, Jr., described the results of this search in his May 1, 2002, affidavit in support of a warrant to search Lata's room at the Villager. Peralta's affidavit included detailed accounts of the March 14, 2003, robbery and escape obtained from the bank manager and tellers, as well from the customers who had followed the van. The affidavit also recounted the investigations conducted by McLeod and Miller, including a description of the items Miller had found inside the van.

The FBI found, <u>inter alia</u>, a black Nike cap and a box of bandaids in Lata's hotel room when they executed the warrant. A federal grand jury later subpoenaed Lata to New Hampshire, where he was photographed wearing the Nike cap and jacket seized from the van as well as a fake mustache and a bandaid on his nose. On May 8, 2003, Special Agent John Mulvaney of the FBI telephoned Lata, who represents in the motion that their conversation consisted primarily of Mulvaney's "attempting to draw [Lata] into a discussion regarding the items seized in the search of the

7

defendant's van and [hotel room]."

On September 16, 2003, McLeod and Mulvaney met with Debelis, Gervais, Leedberg, and Whelan at their Citizens branch. Mulvaney had also met with the witnesses previously, on September 4, 2003. For the September 16 meetings, Mulvaney had created a single page of eight numbered photographs, one of which was the picture of Lata wearing the cap, jacket, mustache, and bandaid taken pursuant to the grand jury subpoena. Each of the other photographs depicted a different FBI employee wearing the same items. Mulvaney testified that he selected the employees for the array based on the similarity of their facial features to Lata's and to reflect the range of ages of the November 12 robbery suspect as reported by the witnesses. One of the FBI employees shown in the array was thirty-one years old at the time, three were approximately forty, and another three were fifty or older.

McLeod and Mulvaney met with each of the Citizens employees separately in an office. Each was given the opportunity to review her prior statement to the Nashua police about the robbery, then shown the array and advised to take as much time as she needed to review it. The witnesses were not told whether the suspect was pictured in the array. In fact, neither Mulvaney nor McLeod said anything else to any of the witnesses before they looked at the photographs, save for Mulvaney's instructions that "if they were to select an individual, to simply initial on the

8

back of the photo spread" with the number of their selection.

Debelis, the first witness to view the array, used this method to indicate photograph number 2, which depicted Lata. She took approximately ten minutes to make her selection but testified that she knew number 2 showed the robber "from the first moment [she] looked at the pictures." Before the next witness entered the office, Mulvaney used a Post-It note to conceal what Debelis had written on the back of the array. The same procedure was followed for each of the other three witnesses, all of whom selected photograph number 2. Leedberg, Whelan, and Gervais each took no more than two or three minutes to make her selection. After each witness made her selection, Mulvaney instructed her not to discuss it with the others. Each of the employees testified that this instruction was followed.

On December 17, 2003, a federal grand jury in this district indicted Lata on one count of bank robbery in violation of 18 U.S.C. § 2113(a) arising out of the November 12 robbery.

Discussion

I.   Miller's Warrantless Search of the Van

Lata seeks to suppress the physical evidence collected during the FBI's search of the van and hotel room on the theory

that those aspects of the investigation grew out of the initial warrantless search of the van by Miller.  Although Lata characterizes that action as illegal because it does not qualify as an inventory search, the government does not rely on the inventory search exception.  Instead, the government argues that Miller's examination of the van was supported by probable cause to believe it contained evidence of both its reported theft and the March 14 robbery.

The warrantless search of an automobile based upon probable cause to believe it contains evidence of a crime does not violate the Fourth Amendment.  Maryland v. Dyson, 527 U.S. 465, 467 (1999); United States v. Fiasconaro, 315 F.3d 28, 37 (1st Cir. 2002) (citing Carroll v. United States, 267 U.S. 132, 153 (1925)); United States v. Staula, 80 F.3d 596, 602 (1st Cir. 1996).  On March 17, 2003, Lata complained to the Ocean Springs police that his van had been stolen from the parking lot of the Villager Inn and provided a description of the vehicle, including the license plate and vehicle identification numbers.  About a week later, Miller learned that a van matching that description had been found in New Orleans and towed to a repair shop.  Based on this information, Miller had probable cause to believe that the van contained evidence that it had been stolen from Lata. See 3 Wayne R. LaFave, Search and Seizure § 7.4(d) (3d ed. 1996) ("if an officer has probable cause to believe that a vehicle has

10

been the subject of . . . theft, he may make a limited entry and investigation . . . of those areas he reasonably believes might contain evidence of ownership") (internal quotations omitted).

Lata relies heavily on his assertion that Miller "searched the vehicle with the intent to obtain evidence concerning the bank robberies in New Hampshire," rather than to assist in any stolen vehicle investigation. Between the time Lata reported the van stolen and the search took place, Miller did learn from McLeod that the van had allegedly been used in the March 14 robbery. The only effect this information had on Miller's ability to search the van, however, was to furnish additional probable cause. Miller now had reason to believe that the vehicle had been involved in two crimes, a theft and a robbery, instead of just a theft. The warrantless search of the van was therefore supported by probable cause.[3] Accordingly, the fact that the issuance of the subsequent warrants for the van and the hotel was based in part on information learned from Miller's

---

[3]According to Miller's report, McLeod told him that a vehicle which had been reported stolen to the Ocean Springs police "was a suspect vehicle that had been involved in a bank robbery." In the court's view, this information alone provided probable cause for Miller to search the van in connection with the robbery. Even if it did not, however, McLeod knew enough information at that time about the van's involvement in the March 14 robbery to establish probable cause for the search and his knowledge is imputed to Miller under the "fellow officer rule" whether it was communicated to him or not. See United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997).

search has no effect on their validity.

II.  <u>The Accuracy of the Search Warrant Applications</u>

Lata contends that Cosenza's affidavit in support of the warrant to search the van omitted a number of facts learned in the investigation of the March 14 bank robbery which tended to exculpate Lata.  Specifically, Lata argues that Cosenza failed to mention that none of the employees of the Citizens branch involved in the March 14 robbery were able to pick Lata's picture out of a photo array, including the manager, who gave a description of the perpetrator which does not fit Lata.

In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court recognized a defendant's right to challenge "the veracity of a sworn statement used by police to procure a search warrant." <u>Id.</u> at 155; <u>see also</u> <u>United States v. Strother</u>, 318 F.3d 64, 69 (1st Cir. 2003).  To receive a hearing for this purpose, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause . . . ." <u>Franks</u>, 438 U.S. at 155-56; <u>United States v. Santana</u>, 342 F.3d 60, 66 (1st Cir. 2003), <u>cert. denied</u>, 124 S. Ct. 1478 (2004).  The omission of a material fact from the affidavit supporting a warrant is

12

treated as a false statement for purposes of the <u>Franks</u> analysis. <u>United States v. Castillo</u>, 287 F.3d 21, 25 (1st Cir. 2002); <u>United States v. Charles</u>, 213 F.3d 10, 23 (1st Cir. 2000). In the case of an omission, "suppression should be ordered only if the warrant application, . . . clarified by disclosure of previously withheld material, no longer demonstrates probable cause." <u>United States v. Stewart</u>, 337 F.3d 103, 105 (1st Cir. 2003); <u>Castillo</u>, 287 F.3d at 25 n.4 ("With an omission, the inquiry is whether its inclusion in an affidavit would have led to a <u>negative</u> finding by the magistrate on probable cause.")

The court denied Lata's request for a <u>Franks</u> hearing in its order of March 26, 2004, because the facts which he accuses Cosenza of omitting from his affidavit are not material to the determination of probable cause. As the government notes, while the inability of witnesses to the March 14 robbery to pick Lata out of a photo array arguably cuts against a finding that he committed that crime, it has no effect on the conclusion that <u>whoever</u> robbed the bank drove away in the van for which the warrant was issued.[4]

_____

[4]Lata also points out that Cosenza's affidavit did not disclose the fact that witnesses to the November 12 robbery "identified someone else . . . as the robber" from the photo arrays they viewed later that month. In fact, Cosenza's affidavit did not mention the November 12 robbery at all, but sought to establish a connection between the van and the March 14 robbery. Accordingly, information potentially exculpating Lata of the November 12 robbery was in no way material to whether

13

Cosenza's affidavit amply demonstrates probable cause to believe that the van contained evidence of the November 14 robbery, including the report of two bank customers that they followed the suspect as he drove off in a vehicle matching the description of the van right down to the first four or five digits of the plate number. If Cosenza had mentioned the fact that other witnesses to the November 14 robbery did not identify Lata as the perpetrator, then, his affidavit would still have supplied probable cause to search the van. See United States v. Higgins, 995 F.2d 1, 4 (1st Cir. 1993) (finding fact that suspected informant unsuccessfully tried to buy drugs from defendant immaterial to probable cause to search defendant's home because "not necessarily inconsistent" with information that defendant later purchased quantity of drugs); cf. United States v. Vigeant, 176 F.3d 565, 573-74 (1st Cir. 1999) (declining to find that good faith exception saved search under warrant not based on probable cause where affidavit contained "numerous omissions of material facts," including that defendant had filed accurate report of transaction alleged to be money laundering).

While Lata concedes that "Peralta's affidavit in support of the warrant for the search of the [hotel room] was without doubt more complete" than Cosenza's affidavit, he nevertheless mounts a Franks challenge to it as well. The only deficiency Lata

_____

probable cause existed to search the van.

14

identifies in Peralta's affidavit, however, is its omission of the fact that "multiple witnesses to one of the robberies had identified a suspect other than the defendant as the robber." Because the affidavit refers to the differing descriptions of the perpetrator given by the witnesses to the March 14 robbery and their inability to pick Lata out of a photo array, the court assumes that Lata is referring to the comments of Gervais, Leedberg, and possibly the drive-through tellers that one of the men shown in the November 19 array had similar features to the suspect in the November 12 robbery. That information, however, has no relevance whatsoever to whether Lata committed the March 14 robbery and Peralta's affidavit readily demonstrates probable cause for that proposition, most notably that Lata acknowledged owning the van reportedly used in that crime. In fact, Peralta did not rely at all on Lata's suspected role in the November 12 robbery in procuring the warrant for the hotel room.

Lata has failed to show that the facts omitted from the warrant applications would have led a magistrate not to find probable cause to search the van and the hotel room. Accordingly, his motion to suppress the fruits of those searches, including whatever statements he made to Mulvaney during their May 8 conversation, is denied.

15

III. The Legitimacy of the Witness Identifications

Lata seeks to exclude evidence that Debelis, Gervais, Leedberg, and Whelan identified him as the perpetrator of the November 12 robbery from the photo array conducted by Mulvaney on September 16, 2003. According to Lata, the other individuals depicted in the array are "not the same approximate age" as and have "distinctly different" facial features from him, rendering the procedure impermissibly suggestive. Lata does not challenge the legitimacy of the identification procedure on any other grounds, e.g., that Mulvaney or McLeod influenced any of the witnesses to select Lata's photograph.[5]

The Supreme Court "has fashioned a two-pronged test for the exclusion of identifications based upon impermissibly suggestive photo arrays. The first prong involves determination of whether the identification procedure was impermissibly suggestive." United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)); see also United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003), cert. denied, 123 S. Ct. 2597 (2004). The defendant bears

---

[5]Based on the series of the different witnesses' initials which appears on the back of the array used on September 16, Lata had argued in his motion that the procedure was tainted because "each successive witness would have seen that the prior witnesses had also picked out [Lata] as the robber." However, Mulvaney and all of the Citizens employees testified at the hearing that any prior identifications written on the array had been covered with a Post-It by the time the next witness viewed it.

the burden to show that the procedure fails this test.  United States v. Meyer, 359 F.3d 820, 824 (6th Cir. 2004); English v. Cody, 241 F.3d 1279, 1282 (10th Cir. 2001); accord United States v. Guzman-Rivera, 990 F.2d 681, 682 (1st Cir. 1993).

In assessing the suggestiveness of photographic identification procedures, courts have considered the similarity in appearance of the individuals depicted in the array, the number of pictures used, and the extent to which the arrangement of the photographs points to the defendant.  See, e.g., United States v. Flores, 149 F.3d 1272, 1279 (10th Cir. 1998) (considering number of photographs and similarity of subjects' builds, heights, ages, and hairstyles); 2 Wayne R. LaFave et al., Criminal Procedure § 7.4(e) (2d ed. 1999).

Based on its review of the photographic array shown to the witnesses on September 16, the court concludes that it was not impermissibly suggestive within the meaning of Simmons.  While all of the others pictured in the array are in reality younger than Lata, that fact alone does not make the use of the array improper, because at least some of the men look to be around the same age as Lata.  In any event, composing the array exclusively of people nearly as old as Lata might have been unduly suggestive in its own right, given the acknowledgment in his motion that witnesses described the November 12 robber as, variously, "in his early 40's [sic], in his 50's, mid 30's-40's, 40-50, 40 ish

17

[*sic*]." As Mulvaney explained, the ages of the men selected to appear in the array with Lata correspond closely to this range of ages as reported by the witnesses. See United States v. Galati, 230 F.3d 254, 260 (7th Cir. 2000) (upholding admission of identifications from photo array where six men pictured "all fit the general descriptions" provided by witnesses, even though two were "somewhat older and heavier" than defendant).

Finally, the court disagrees with Lata's assessment that he has "distinctly different" facial features from the FBI employees used for the array. Many of the men have eyes and complexions similar in color to Lata's. Indeed, the court notes the strong resemblance between the picture of Lata used in the array and photograph number 7, which depicts a different person.[6] Furthermore, each of the photographs comprising the array shows its subject wearing the same black knit cap and navy blue jacket, with a bandaid across the bridge of his nose. This attire not only corresponds with that worn by the November 12 robber, but tends to lessen the effect of any differences in physiognomy among the men depicted in the array. All of the photographs also appear to have been taken from the same distance and against the same background.

---

[6]According to Mulvaney's testimony, although Gervais picked Lata out of the array, she "said it was a close call" between his picture and photograph number 7.

18

Because Lata has failed to show that the procedure used to procure the witness identifications was impermissibly suggestive, the court need not consider the second prong of the <u>Simmons</u> test. <u>See</u> <u>Maguire</u>, 918 F.2d 254. The identifications of Lata from the September 16 photo array are admissible.


## Conclusion

For the foregoing reasons, Lata's motion to suppress (document no. 7) is denied in its entirety.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 8, 2004

cc:  Jonathan R. Saxe, Esquire
     Clyde R.W. Garrigan, Esquire
     U.S. Probation
     U.S. Marshal