# United States Court of Appeals
## For the First Circuit

No. 13-2156

UNITED STATES OF AMERICA,

Appellee,

v.

ALVIN PENNUE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Barron, Circuit Judges.

Syrie D. Fried for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

November 5, 2014

**SELYA, Circuit Judge.** As long as human beings rather than computers preside over jury trials, slips of the tongue will occur. But not every such lapsus linguae requires setting aside a jury verdict. In this case, the trial judge's slip of the tongue during jury instructions elicited no objection and, when considered in the context of the jury instructions as a whole, was highly unlikely to have muddled the jury's understanding of the judge's charge. Because we find neither reversible error in this respect nor a shortfall in the district court's sentencing determinations, we reject the defendant's appeal.

## I. BACKGROUND

This case involves what is colloquially known as a black money scheme. See generally United States v. Gayekpar, 678 F.3d 629, 633, 635 (8th Cir. 2012); United States v. Wright, 642 F.3d 148, 150-51 (3d Cir. 2011). In October of 2011, defendant-appellant Alvin Pennue made the acquaintance of Wendell Bradford while both men were enjoying the scenery and liquid refreshments at a nightclub in Providence, Rhode Island. The pair later met to discuss a possible business venture. The defendant showed Bradford a bundle of black paper wrapped in cellophane and said that it was genuine United States currency, which had been dyed black in order to smuggle it out of Africa. The defendant explained that the money could be "cleaned" by applying a combination of chemicals and sandwiching clean bills between the blackened bills. A

-2-

demonstration ensued: the defendant inserted a $20 bill supplied by Bradford between two pieces of black paper, sprinkled the "sandwich" with chemicals, wrapped it in aluminum foil, and applied pressure. After a short interval, he opened the "sandwich" and doused the paper with spring water. Three clean $20 bills emerged.

Bradford was impressed but not convinced. He agreed, however, to meet with the defendant's associate, Anthony Chadheen. The defendant and Chadheen came to the service station where Bradford worked. They showed him a color photograph of what was purported to be $2,000,000 of black money. After witnessing another demonstration, Bradford swallowed the bait and agreed to invest $5,000 in a black money transformation in exchange for a fifty-percent share of the cleaned money.

Things that seem too good to be true usually are. On October 21, Bradford withdrew $5,000 from a Massachusetts bank and brought the cash to Providence. In a hotel room there, the defendant and Chadheen sandwiched Bradford's money between sheets purported to be black money. The defendant then took the "sandwich" into the bathroom, doused it with chemicals, wrapped it with foil and tape, and gave the package to Bradford to hold (telling him that it would take roughly thirty minutes for the cleaning process to run its course). The defendant and Chadheen left Bradford with the package, which proved to contain nothing but soggy black paper.

In the same time frame, another potential dupe (Mark Falugo) contacted the Secret Service about a similar scam. At the authorities' behest, Falugo called the defendant and discussed a prospective black money transformation. Falugo offered to invest $25,000 and indicated that he had a friend who might be willing to invest four times that amount.

As the sting evolved, Fred Mitchell, an undercover Secret Service agent, assumed the persona of Falugo's friend. Falugo and Mitchell met with the defendant and Chadheen in Warwick, Rhode Island. Chadheen performed a cleaning demonstration for Mitchell. As before, the process appeared to work, and Chadheen allowed Mitchell to keep the cleaned money (two $100 bills). Mitchell was also shown glossy photographs of stacks of black money and what appeared to be genuine bills.

Mitchell subsequently arranged to meet with the defendant and Chadheen to clean a large sum of black money. He purported to bring $100,000 in cash to the meeting. The defendant and Chadheen showed him bundles of what they claimed to be blackened currency, which in fact consisted of nothing more than black construction paper. Without further ado, the Secret Service arrested the defendant and Chadheen.

A federal grand jury charged the defendant, inter alia, with two counts of passing altered obligations of the United States with intent to defraud, see 18 U.S.C. § 472, and one count of

-4-

inducing the interstate transportation of currency with intent to defraud, see id. § 2314.[1]  At trial, the government presented a plenitude of evidence, including testimony of Bradford and Mitchell, recordings of two of Mitchell's meetings with the scam artists, and tapes of various telephone conversations.  The jury found the defendant guilty on all three counts.  In due season, the district court sentenced the defendant to a 21-month term of immurement.  This timely appeal followed.

## II.  ANALYSIS

On appeal, the defendant challenges both his convictions and his sentence.  We subdivide our analysis accordingly.

### A.  The Convictions.

The defendant's challenge to his convictions rests on a claim of instructional error.  He argues that the jury charge was rendered infirm by a mis-description of the reasonable doubt standard.  Specifically, he points to the court's statement that:

> Reasonable doubt exists when, after weighing and considering all the evidence using reasonable and common sense, jurors say that they have a settled conviction of the truth of the charge.  On the other hand, reasonable doubt does not exist when, after weighing and considering all the evidence using reason and common sense, jurors can say that they have a settled conviction of the truth of the charge.

---

[1] The grand jury charged Chadheen in the same indictment. Chadheen absconded and remains a fugitive.

It is readily apparent that the first sentence is missing a negative: it should have read, "Reasonable doubt exists when, after weighing and considering all the evidence using reasonable and common sense, jurors <u>cannot</u> say that they have a settled conviction of the truth of the charge." (Emphasis supplied). Given this bevue, the quoted portion of the court's instruction twice defined the absence of reasonable doubt and never defined its presence. In the defendant's view, this error impermissibly diluted the government's burden of proof.

When — as in this case — an appellant's claim is that the trial court's jury instructions misstate the law, appellate review is ordinarily de novo. See <u>United States</u> v. <u>Barnes</u>, 251 F.3d 251, 259 (1st Cir. 2001); <u>United States</u> v. <u>Pitrone</u>, 115 F.3d 1, 4 (1st Cir. 1997). Here, however, the defendant did not object to the challenged instruction at trial, thus failing to call the slip to the court's attention so that it could have been corrected. Consequently, appellate review is for plain error. See <u>Johnson</u> v. <u>United States</u>, 520 U.S. 461, 465-66 (1997); <u>United States</u> v. <u>O'Shea</u>, 426 F.3d 475, 481 (1st Cir. 2005).

The defendant resists this conclusion. He insists that, even though no objection was interposed below, the error was structural and, thus, demands automatic reversal. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Yakobowicz</u>, 427 F.3d 144, 153-54 (2d Cir. 2005).

This is wishful thinking. Although the Supreme Court has recognized that an incorrect reasonable doubt instruction may constitute a structural error, see Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993), it has made pellucid that, in the federal system, unpreserved claims of structural error are to be reviewed under the plain error standard, see Johnson, 520 U.S. at 465-66. Consistent with this approach, we repeatedly have stated that plain error review is appropriate when a criminal defendant points out a defect in a reasonable doubt instruction for the first time on appeal. See United States v. Jones, 674 F.3d 88, 93 (1st Cir. 2012); O'Shea, 426 F.3d at 481; United States v. Colon-Pagan, 1 F.3d 80, 81 (1st Cir. 1993). That is the situation here.

The contours of plain error review are familiar. The appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). The appellant must carry the devoir of persuasion as to each part of this four-part standard. See United States v. Vega Molina, 407 F.3d 511, 521 (1st Cir. 2005). The defendant's claim of instructional error stumbles at the third step.

Manifestly, the first sentence in the quoted instruction contains an error. But not all errors in jury instructions affect

-7-

a defendant's substantial rights. In evaluating a flawed jury instruction, we look to whether the error was reasonably likely to have misled the jury. See United States v. Troy, 618 F.3d 27, 33 (1st Cir. 2010); United States v. Romero, 32 F.3d 641, 651 (1st Cir. 1994). In conducting this tamisage, we do not assess the problematic instruction in isolation but, rather, inspect the jury charge as a whole. See United States v. Van Anh, 523 F.3d 43, 58 (1st Cir. 2008); United States v. Cintolo, 818 F.2d 980, 1003 (1st Cir. 1987).

Viewing the challenged instruction within this framework, it is evident that the instruction was unlikely to have clouded the jurors' understanding of the government's burden of proof. To begin, the erroneous instruction was followed immediately by a correct instruction. The two sentences were obviously intended to set up a comparison. Together, they supplied a contrast between a circumstance where jurors do not have a settled conviction of the truth of the charge and one where the jurors do. This structure makes it quite probable that the jury would have inferred the missing word "cannot" in order to parse the instructions sensibly. Cf. United States v. Lebron-Gonzalez, 816 F.2d 823, 830 (1st Cir. 1987) (concluding that missing "if" in jury instruction was not reversible error where passage made sense only if missing "if" was inferred).

-8-

Such a conclusion is reinforced by the fact that the defendant did not object. See United States v. Flores, 454 F.3d 149, 158 (3d Cir. 2006) (remarking that "counsel's failure to object leaves us with the impression that the misstatement in the oral charge was hardly noticeable"). Indeed, no one seems to have noticed the court's slip of the tongue at the time it happened.

The effect of the problematic instruction is also palliated because the district court was reading from a manuscript. Although the court misspoke when it read the challenged portion of the charge, the written copy of the instructions that it furnished to the jury for use during deliberations contained no error. Although we would hesitate to rely on written instructions alone as a basis for concluding that the jury was not likely to be misled by an incorrect oral instruction, cf. Guam v. Marquez, 963 F.2d 1311, 1315-16 (9th Cir. 1992) (expressing concern that jurors may not read written instructions), the fact that the jury received correct instructions in writing bolsters our confidence that the error complained of here was harmless.

To cinch matters, the erroneous instruction was surrounded by instructions that emphasized the government's heavy burden of proof. We offer some examples.

- The court told the jury: "It is not sufficient for the Government to establish a probability,

though a strong one, that a fact charged is more likely true than not true."

- The court stated that probability "is not enough to meet the burden of proof beyond a reasonable doubt."

- The court referred to the government's "strict and heavy burden" and cautioned that "[p]ossibilities or even probabilities are not sufficient."

- The court left no doubt that the defendant "should not be convicted on suspicion or conjecture."

- The court declared no fewer than five times that the burden of proving the defendant's guilt rested solely and entirely with the government.

- The court referenced the government's burden to prove guilt no fewer than twenty times, and it aptly described the presumption of innocence at least four times.

Given the tenor of the charge as a whole, it would take the elevation of hope over reason to believe that the district court's lapsus linguae diluted the government's burden of proof. See, e.g., Van Anh, 523 F.3d at 58-59; United States v. Ranney, 298 F.3d 74, 80 (1st Cir. 2002); Romero, 32 F.3d at 651-52.

-10-

That ends this aspect of the matter. We conclude that, in all likelihood, the error in the spoken charge did not compromise the jury's understanding of the reasonable doubt standard. It follows that the district court's slip of the tongue did not affect the defendant's substantial rights. As such, plain error was plainly absent.

## B. **The Sentence.**

The defendant's claim of sentencing error implicates the district court's calculation of the guideline sentencing range (GSR). To set the stage, we start with the presentence investigation report (PSI Report), which recommended sorting the offenses of conviction into two groups. See USSG §3D1.1. Group 1 comprised the two convictions for passing altered obligations. These convictions, respectively, were based on the defendant's passing of two blackened $100 bills to Mitchell and two blackened $20 bills to Bradford. Group 2 comprised the conviction for fraudulently inducing the interstate transportation of currency based on Bradford's carriage of $5,000 across state lines.

The base offense level for Group 1 was 9. See id. §2B5.1(a). The base offense level for Group 2 was 6. See id. §2B1.1(a)(2). However, the PSI Report recommended a 10-level upward adjustment for Group 2 based on a loss in excess of approximately $130,000. See id. §2B1.1(b)(1) (establishing 10-level enhancement for losses between $120,000 and $200,000). This

proposed adjustment took account of the intended (but not realized) losses involving Falugo and Mitchell.

The PSI Report, using conventional grouping principles, see id. §§3D1.1-3D1.4, concluded that Group 2's adjusted offense level (16) controlled and recommended that the defendant be placed in criminal history category I. These calculations yielded a GSR of 21-27 months.

The district court convened the disposition hearing on September 6, 2013. With one exception, the parties acquiesced in the guideline calculations adumbrated in the PSI Report. The lone objection was voiced by the defendant. He argued that he could not have intended both the $25,000 loss to Falugo and the $100,000 loss to Mitchell because, believing that Falugo and Mitchell were associates, he would have anticipated that, once one was defrauded, the other would learn of the scam. The district court rejected this speculative objection and adopted the guideline calculations limned in the PSI Report.[2] The court then sentenced the defendant to a term of imprisonment at the nadir of the GSR (21 months).

In this venue, the defendant shifts gears. He abandons his original objection to the loss calculation and argues instead

_____

[2] All concerned — the defendant, the government, the probation department, and the district court — assumed that the total offense level was 16. Withal, a proper application of USSG §3D1.4 produces a total offense level of 17. But no one — then or on appeal — has seized upon this discrepancy; and because any error in this respect inured to the benefit of the defendant, we do not press the point.

that the sentencing court impermissibly considered intended losses. As a fallback, he argues that even if intended losses are not categorically banned, the intended losses here were not relevant for the purpose of calculating his GSR.

In the ordinary course, we review the district court's application of the sentencing guidelines de novo and review its subsidiary factfinding for clear error. See United States v. LaCroix, 28 F.3d 223, 226 (1st Cir. 1994). When a claim of sentencing error is unpreserved, however, plain error review obtains. See Duarte, 246 F.3d at 59-60.

The claims of error mounted by the defendant are new. In the proceedings below, he never opposed the inclusion of intended losses as a specie.[3] Even though he objected to the amount of the loss calculations attributable to the Falugo and Mitchell swindles, he never suggested that intended losses could not be considered. Our review, therefore, is for plain error.

Section 2B1.1(b)(1) of the sentencing guidelines expressly provides for enhancing the offense level applicable to a fraud charge for amount of loss. See USSG §2B1.1, comment. (n.3(A)) (stipulating that "loss" is the greater of the actual or intended loss). The defendant's argument to the contrary appears

---

[3] Indeed, in written objections to the preliminary PSI Report, the defendant acknowledged that "[i]t is axiomatic that 'intended losses' can be utilized in determining an offense level for theft and fraud."

to be based on a misapprehension. Although an enhancement based on intended loss is not authorized under section 2B5.1 for counterfeiting offenses, see Wright, 642 F.3d at 154, such a proscription does not apply to fraud charges, see USSG §2B1.1; see also United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012).

This brings us to the amount of intended loss found by the district court. The record contains evidence both of a scheme to hoodwink Falugo in a $25,000 black money transformation and a plan to bilk Mitchell in a like $100,000 transformation. For guidelines purposes, the phrase "intended loss" may include intended pecuniary loss that is unlikely (or even impossible) such as, say, a loss projected from a government sting operation. See USSG §2B1.1, comment. (n.3(A)(ii)(II)). Given this construct, the amounts involved were appropriately classified as intended losses. See United States v. Stergios, 659 F.3d 127, 135 (1st Cir. 2011) (defining "intended loss" as a loss that would have been expected by an objectively reasonable person in the defendant's position at the time of the fraud). With this evidence before it, the sentencing court had a solid basis for concluding that the intended loss was more than $120,000.

Of course, due to the operation of grouping principles, the offense of conviction that drove the defendant's sentence involved the interstate transportation of currency with intent to defraud Bradford. Here, however, the sentencing court did not err

in cataloguing the conduct underlying the other counts (the defendant's abortive efforts to hornswoggle Falugo and Mitchell) as relevant conduct. Section 1B1.3(a)(2) of the sentencing guidelines provides that, with respect to offenses where grouping of multiple counts is required by section 3D1.2(d), the offense level should be determined by considering not only the conduct underlying the offense of conviction but also any "relevant conduct." The term "relevant conduct" is a term of art that encompasses all acts and omissions that were part of the same "course of conduct or common scheme or plan as the offense of conviction." USSG §1B1.3(a)(2); see United States v. Eisom, 585 F.3d 552, 557 (1st Cir. 2009).

The record amply supports a conclusion that the defrauding of Bradford and the planned defrauding of Falugo and Mitchell were part of the same course of conduct. After all, each of the swindles took place in the same area and in the same time frame. They shared many pertinent characteristics, including the methods used, the nature of the artifice employed, a common fraudster, a common accomplice, and a common modus operandi. Those shared characteristics were sufficient to ground a finding that the gammons were cut from the same cloth and, thus, formed part of a pattern. See USSG §1B1.3, comment. (n.9); see also Eisom, 585 F.3d at 557; United States v. Jaca-Nazario, 521 F.3d 50, 55-56 (1st Cir. 2008). There was no sentencing error, plain or otherwise.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment below is


**Affirmed**.