# United States Court of Appeals
## For the First Circuit

---

Nos. 11-2328
    12-1442
    12-2412

UNITED STATES OF AMERICA,

Appellee,

v.

RAMÓN LANZA-VÁZQUEZ, a/k/a Ramoncito;
LUIS R. NIEVES-CANALES, a/k/a Sito;
RAFAEL GALÁN-OLAVARRÍA, a/k/a Galán,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

---

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

---

David Shaughnessy for appellant Rafael Galán-Olavarría.
Lydia Lizarríbar-Masini for appellant Luis Nieves-Canales.
Inga L. Parsons for appellant Ramón Lanza-Vázquez.
Olga B. Castellón-Miranda, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Juan Carlos Reyes-Ramos, Assistant United States Attorney, were on brief, for appellee.

August 27, 2015

**HOWARD, <u>Chief Judge</u>**.  Ramón Lanza-Vázquez ("Lanza"), Luis R. Nieves-Canales ("Nieves"), and Rafael Galán-Olavarría ("Galán"), (collectively, "the defendants"), appeal convictions and sentences resulting from their participation in a drug distribution conspiracy.  They lodge a litany of challenges covering nearly every aspect of the proceedings below.  Finding no reversible error, we affirm.

## I.

We begin by briefly sketching the facts most relevant to our analysis.[1]

### A.        The Drug-Trafficking Operation

This case arises from a drug trafficking operation at the Jardines de Sellés Housing Project in San Juan, Puerto Rico ("Sellés").  On January 26, 2000, the leader of that operation, Luis Daniel Rivera, was murdered.  This created a leadership vacuum, which Alberto Carillo-Morales ("Alfalfa") swiftly moved to fill.  Within two days, he had succeeded in taking control.

Upon taking power, Alfalfa adopted an unforgiving and oppressive management style.  He held regular meetings with his

---

[1]  The background facts of the conspiracy and the defendants' roles in the conspiracy are relevant to Nieves' sufficiency of the evidence challenge.  We therefore view them in the light most favorable to the jury verdict.  <u>See</u> <u>United States</u> v. <u>Burgos</u>, 703 F.3d 1, 4 n.1 (1st Cir. 2012).  We consider the remaining facts -- those relevant to the remaining challenges that we discuss in this opinion -- in a "balanced" manner.  <u>See</u> <u>United States</u> v. <u>Burgos-Montes</u>, 786 F.3d 92, 99 (1st Cir. 2015).

closest co-conspirators to discuss the operation and to plot strategy. If an individual sold drugs at Sellés, he or she was doing so on Alfalfa's behalf or with his blessing. Indeed, the jury could have concluded that Alfalfa would order his gang to kill or harm any individual who either disobeyed that rule or who merely expressed disagreement with his decisions.

As for the drug business itself, Alfalfa implemented a number of changes. The jury heard evidence that Alfalfa instituted a hierarchical system: drug "owners" were responsible for obtaining drugs (and benefitted most from the sales); "runners" transported the drugs and money from owner to seller; and "sellers" positioned themselves at drug points to distribute the goods. "Enforcers" were also tasked with protecting the drug points at Sellés, which operated 24 hours a day. Relatedly, Alfalfa expanded the number of drug points at Sellés, and his subordinates sold a variety of drugs including crack cocaine, powder cocaine, heroin, and marijuana. The bags containing his drugs typically included a sticker bearing the face of Osama Bin Laden.

After tightening his grip on power at home, Alfalfa turned outwards. Around 2004, Alfalfa ordered his men, armed with guns, to take over the operation at the El Prado housing unit. They successfully did so. Around the same time, he took over Las Flores, a housing project in nearby Aibonito. He also briefly took control of the Liborio Ortiz Housing Project. These territorial

grabs consistently ignited shootings and fights among the different drug-trade organizations.

**B.        The Defendants**

The three defendants in this case each joined Alfalfa's operation at different times and in distinct ways.  For instance, the jury could have found that Defendant Nieves was one of Alfalfa's initial co-conspirators.  From the beginning, he was a drug owner; he specifically owned the "$12 bag" of marijuana.  In addition to selling that product at Sellés, he served as an enforcer and protector at drug points.  Although he lawfully possessed a number of guns, he also carried several illegal firearms.  Moreover, he participated in shootings with rival gangs when it suited his boss's interests.

The evidence likewise supported the finding that Defendant Galán joined Alfalfa's operation as a seller at Sellés.  Early on, he expressed an interest in rising through the ranks of the organization, as he wanted to become a drug owner himself.  Alfalfa's expansion into El Prado provided Galán with that opportunity.  He became an owner of a brand of marijuana at El Prado and enlisted José Serrano-Ayuso ("Serrano") to serve as his runner.  The two met nightly at Galán's apartment, where Serrano would deliver money and the men would count it together.

Finally, evidence established that Lanza joined Alfalfa's group after leaving a rival organization.  He served as a seller,

enforcer, and (occasionally) as a runner. As time progressed, his role became more substantial; for instance, he was invited to join Alfalfa's weekly meetings. He also became owner of the "green-capped" crack at El Prado. As a result, Lanza was spotted conducting business at El Prado on a nearly nightly basis.

**C.        The Investigation and Indictment**

These illicit activities did not go unnoticed, and an investigation into Alfalfa's operation by a San Juan Metro Strike Force accelerated in May and June of 2007. As part of that investigation, agent Jorge L. Cedeño surveilled the El Prado apartments. He positioned himself in a parking lot facing Galán's apartment building. According to Cedeño's affidavit, he quickly became familiar with the building's layout, and knew that the second floor had two apartments: one to the left and one to the right (Galán's purported home). From his usual position, he said, he could not see the actual door to the apartment on the right, but he could see the door to the apartment on the left and he could view the stairs leading to the third floor (along with the exit on the third floor).

On at least two occasions between May 30 and June 6, Cedeño purportedly saw Galán walking up to the second floor, turning right, and disappearing for a period of time. Cedeño concluded (since he would have seen Galán go anywhere else) that Galán must have been entering the apartment. On a third occasion,

-6-

according to the agent, he also saw an individual with a black pistol take the same path. Agent Cedeño stated that he also witnessed Galán with certain contraband, including: containers ordinarily used to hold drugs; bags with what appeared to be cocaine inside; and a police radio scanner. Finally, Cedeño claimed that he saw Galán sitting in the stairwell manipulating product.

As noted, Cedeño submitted an affidavit detailing these (and other) observations, and a judge of the San Juan Municipal Court approved a search warrant for Galán's apartment. During the search, the police recovered: a police radio scanner that was turned on; a firearm cleaner; a loaded AK-47 with two magazines; $1,064 in cash; two social security cards; pressure-sealed baggies; and stickers/seals depicting Osama Bin Laden's face. The officer also found registrations for three cars and a driver's license. One of the registrations matched a vehicle seen in video surveillance at a Sellés drug point.

At the conclusion of the investigation, a federal grand jury indicted 121 defendants, including the three in this case. It charged: (count I) conspiracy to possess with intent to distribute drugs; (count II) aiding and abetting possession with intent to distribute heroin; (count III) aiding and abetting possession with intent to distribute crack cocaine; (count IV) aiding and abetting possession with intent to distribute cocaine; (count V) aiding and

abetting possession with intent to distribute marijuana; and (count VI) conspiracy to possess a firearm during and in relation to drug trafficking. Galán was also charged as being a felon in possession of a firearm, (Count VII). Galán, Lanza, and Nieves were jointly tried.

**D.        The Trial, Verdict, and Sentence**

At trial, the government relied on physical evidence (such as the items found in Galán's apartment), the testimony of law enforcement officers (such as Agent Cedeño) and, perhaps most importantly, the testimony of several co-conspirators. Three were prominent.

The first was Wilberto Pizarro-Santiago ("Pizarro") who was a drug seller at Sellés from 1998 to 2005. He subsequently worked for a rival gang. At trial, he testified extensively about Alfalfa's operation and made clear that if an individual sold drugs at Sellés it was on Alfalfa's behalf. He discussed the organization and provided details about the murder of "Geno" -- an associate who had expressed disagreement with Alfalfa's decisions. Pizarro specifically identified Nieves as the owner of the "$12 bag" of marijuana and referenced specific instances in which he saw Nieves carrying firearms. Indeed, he alleged that Nieves was "always armed." In addition to identifying Nieves, Pizzaro also testified that Lanza attended Alfalfa's inner-circle meetings and was an enforcer within the organization.

-8-

The second co-conspirator, Serrano, worked at El Prado as a runner and enforcer for Galán. At trial, he identified Lanza as part of the operation, described Alfalfa's takeover of El Prado, and explained how he came to work directly for Galán. Since he was Galán's runner, Serrano was able to provide substantial detail on their interactions. Serrano also admitted that he was generally armed to protect Galán.

Finally, José Díaz-Martínez testified about his experience working for Alfalfa at both Sellés and El Prado. He described the general framework of the operation and Alfalfa's style of management. He, too, specifically identified Nieves and Galán as being drug owners within the organization. He further explained how Lanza became owner of the green-capped crack at El Prado.

After an eighteen-day trial, a jury returned verdicts finding all three defendants guilty on distinct counts. It first found all three guilty on the initial count of participating in the overarching conspiracy, count I. Additionally, the jury found Lanza guilty of the substantive crack cocaine charge; it found Nieves guilty on the substantive crack cocaine charge, the substantive cocaine charge, the substantive marijuana charge, and the firearm conspiracy charge; and, finally, it found Galán guilty on the substantive marijuana charge, the firearm conspiracy charge, and the felon in possession of a firearm charge. The court then

sentenced Lanza to 240 months in prison, Nieves to 240 months, and Galán to 405 months.

These timely appeals followed.

## II.

Galán, Lanza, and Nieves present a laundry-list of claims ranging from minor evidentiary concerns to broad assertions of cumulative error. We have considered each and have conducted an extensive review of the record. Ultimately, only five issues have merit sufficient to warrant an in-depth exploration.[2] We thus narrow our focus to: (1) Galán's challenge to the search of his apartment; (2) the defendants' concerns respecting the judge's intervention during trial; (3) the defendants' protests respecting the charge to the jury; (4) Nieves' arguments respecting the sufficiency of the evidence against him; and, (5) Nieves' Alleyne sentencing contention.[3]

A.          **Challenge to the Search of Galán's Apartment**

Galán gets the ball rolling with a challenge to the search of his apartment. His central accusation is that Agent

---

[2] We have considered the remaining arguments and find them to be unpersuasive.

[3] In addition to bypassing detailed discussion of several of the defendants' claims, we note the government's concern that the defendants improperly joined each others' appellate arguments and that each defendant failed to independently object at trial. In a closer case, these points could be fruitful. Here, we not need resolve these issues as defendants cannot succeed regardless of their validity.

-10-

Cedeño intentionally falsified observations in the affidavit submitted to obtain a warrant for Galán's residence. The district court, in Galán's view, then erred in ruling otherwise after a Franks hearing. Franks v. Delaware, 438 U.S. 154 (1978) (providing a mechanism for a defendant to challenge the veracity of statements in affidavits submitted to obtain search warrants). He thus asks us to reverse the district court's Franks determination and conclude that the fruits of the search should have been suppressed.

Where, as here, a Franks hearing was held and the challenge is targeted at its results, "[w]e bypass the question of whether [the defendant] made the 'substantial preliminary showing' necessary to invoke a Franks hearing," and, instead, "review de novo the district court's ultimate decision to suppress [or not suppress] the evidence obtained pursuant to the warrant at issue." United States v. Tzannos, 460 F.3d 128, 135-36 (1st Cir. 2006). Any antecedent factual findings are reviewed for clear error. Id. at 136.

To succeed in challenging the affidavit, Galán must show by a preponderance of the evidence that "the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth," and, "that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Id. at 136. While a knowing and intentional falsehood requires proof of intent,

recklessness can be inferred "from circumstances evincing obvious reasons to doubt the veracity of the allegations." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002). A material omission can also form the basis of a Franks violation. United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002).

Galán fails at the first prong. He homes in on Agent Cedeño's repeated statement in the affidavit that he observed Galán or other individuals "entering" or "exiting" the apartment. At the Franks hearing, however, Cedeño testified that he could not technically see the entrance to Galán's apartment because the door was obstructed by a concrete staircase. That inconsistency, Galán insists, exposes an intentional falsehood in the affidavit. Since those alleged observations by Cedeño were the only statements connecting the crime with the apartment, Galán believes that once the statements are excised, no probable cause for the search exists.

We do not evaluate this argument on a blank slate. Instead, the district court made extensive factual determinations and credibility assessments to which we defer unless clearly erroneous. Notably, the magistrate judge (whose decision was adopted by the district court), found that Cedeño

> testified knowing that there are two apartments on the second floor. To the left, there is one apartment, and to the right is the only other door on that floor. He knows this because he has gone up those stairs on several occasions and the distribution is

-12-

always the same. The door cannot be seen because the stairs to the third floor cover the door and if the defendant would have gone up to the third floor, the officer would have seen him because of the visibility. The officer knew that the defendant entered the apartment because there is no other door . . . [h]e stated that he would have seen him going up to third floor.

In the magistrate judge's view, its decision then turned on Cedeño's credibility. The court found Cedeño's explanation to be truthful. Accordingly, the magistrate judge ruled that no Franks violation had occurred.

Regardless of the standard of review, the record -- one which details Cedeño's familiarity with the apartment complex and the intensity of his investigation -- compels the same finding. No evidence supports Galán's belief that Cedeño had any intent to falsify statements or to omit critical information, nor can we even say that there were any actual falsehoods in the affidavit. The circumstances also do not suggest that Cedeño was somehow reckless in writing "entering/exiting" instead of the more precise "I inferred that he entered or exited." Simply put, neither the affidavit nor the hearing transcript supports Galán's view. Instead, as the district court correctly concluded, Cedeño made an obvious and natural inference from his observations. See United States v. D'Andrea, 648 F.3d 1, 14 (1st Cir. 2011) (upholding

denial of a Franks claim when the factual question turned on the reasonableness of the inference from the facts available).[4]

We note that accepting this clear and obvious inference on this record is entirely consistent with the broader purposes underpinning Franks: to ensure that a warrant judge has adequate information to make a decision, and to dissuade officers from misrepresenting their observations. At its core, this requires that the officer is being "truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Franks, 438 U.S. at 165. Here, the warrant judge had sufficient and accurate information with which to base a decision, and nothing in the affidavit (or from the hearing transcripts) leads us to question Cedeño's belief in the statements he provided. We thus find no reason to disturb the lower court's Franks determination.[5]

B.        **Judicial Conduct at Trial**

Lanza and Galán next assert two, interrelated challenges to the judge's conduct during trial: (1) the judge purportedly

---

[4] Galán also points us to two state court cases to support his position. See Commonwealth v. Stewart, 13 N.E.3d 981 (Mass. 2014); Harris v. State, 184 S.W.3d 801, 813 (Tex. App. 2005). But, neither of those cases presented a factual background establishing that the officer's inferences were both obvious and reasonable.

[5] The government also offers the good faith exception as a fall-back position. The clear absence of any error in the affidavit makes going down this potentially dubious path, see United States v. Leon, 468 U.S. 897, 922 n.24 (1984), unnecessary.

-14-

intervened exclusively on behalf of, and associated herself with, the prosecution; and (2) the judge allegedly made improper comments about Galán's attorney. The parties dispute whether these claims were preserved or whether plain error review applies. Given that the defendants cannot succeed under either standard, we need not dither. Under the usual framework for judicial bias claims, a party must still show (1) that "the [judge's] comments were improper" and (2) that there was "serious prejudice." United States v. Ayala-Vázquez, 751 F.3d 1, 24 (1st Cir. 2014); see also United States v. Laureano-Pérez, -- F.3d --, 2015 WL 4577763 at *17 (1st Cir. July 30, 2015).

The defendants' first contention is that the judge excessively interfered on behalf of, and associated herself with, the prosecution. They begin this argument by focusing on the instances when the court allegedly assisted the government. The defendants cite nearly twenty examples where defense counsel objected to the prosecution's question, and the court, rather than merely ruling on the objection, responded by asking the witness a question in a non-objectionable way or by instructing the government on how to properly phrase the question. E.g., ("So counsel, what you want to ask is . . . how [the list] comports to what he used to prepare."); ("[Y]ou stated that at the police headquarters you actually saw what was seized, is that correct?"); ("[A]sk him if he was the arresting agent he will say no and then

-15-

you will ask him if he knows who arrested them. [A]nd then he testified he alerted the other agents."); ("He wants to know how did you get the latent print to look at from the object.") In doing so, the defendants say, the trial judge essentially doffed her judicial robe and joined the prosecution.

Of course, the mere fact that the judge intervened is not enough for us to find error. It is well-established that a judge "is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." Quercia v. United States, 289 U.S. 466, 469 (1933). He or she thus "has a perfect right -- albeit a right that should be exercised with care -- to participate actively in the trial proper." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997). We do not examine a single comment by a judge on its own but, instead, must view it in the context of the entire transcript. United States v. Espinal-Almeida, 699 F.3d 588, 607 (1st Cir. 2012).

As a comprehensive review of this transcript establishes, the judge skirted near the line on discrete occasions but, on the whole, never crossed it. Broadly, the trial lasted 18 days and was a massive, multi-defendant conspiracy case which the court had the authority to move through expeditiously. Cf. Deary v. City of Gloucester, 9 F.3d 191, 194 (1st Cir. 1993) ("The trial judge has discretion to maintain the pace of trial.") Indeed, the judge was quite explicit that this was the court's goal. See, e.g., ("I ask

-16-

that the government use the time [a 15 minute break] to identify the specific spots where they need to go because we need to move faster.").

More concretely, a pattern emerges with respect to the judge's participation. The court generally intervened after a party made a consistent (sometimes repetitive) string of objections, or when an objection was lodged immediately after the parties completed a lengthy bench conference discussing that very same evidentiary issue. In other words, the judge interrupted when the case was unnecessarily slowing down. While it is true that this was generally done to the benefit of the prosecution -- though, contrary to what the defendants insinuate, not exclusively so -- the interactions were largely driven by defense counsels' own conduct. Defense counsel asserted a plethora of objections (often repeatedly so or after the judge had made her rulings clear), while the prosecution exhibited more restraint. Diligent defense of a client is certainly encouraged, but technical and repetitive interruptions may properly prompt the trial judge to intervene to proceed the trial. Indeed, the judge indicated this on several occasions by saying, for example, "Stop basically, you should stop objecting on the same grounds it is clear . . . You can further inquire on cross." The judge was not, despite the defendants insistence, gratuitously interfering.

With respect to this initial claim, Lanza and Galán also invoke instances where they allege that the judge affirmatively identified herself with the government and thus, in their view, turned the jury against the defendants. Three statements, at first blush, could appear fairly damaging. For example, at one point the judge said, "Then you get the name in, just to avoid the hearsay that you got . . .[b]ecause the jury is able to compare, corroborate or discredit whatever the informant said. We need that in." (emphasis added). On another occasion, the judge alluded to the defendants' guilt, stating that, the "proper time" for an argument "would be at the sentence." Finally, in response to a defendant's objection, the judge said "the government does not have any interest to portraying something that is not and it is clear that the pictures were taken after the search was executed."

These statements in which the judge allegedly "associated" herself with the prosecution are ultimately not concerning. In a vacuum, each conceivably could be deemed problematic. In context, however, they were not inappropriate for the simple reason that the targeted statements were made outside of the jury's presence. Since our focus centers on whether the statements affected the jury (or whether they are so egregious on their own as to demand significant scrutiny -- which was not the case here) statements that occur outside of the jury's presence are generally kosher. United States v. Rivera-Rodriguez, 761 F.3d 105,

-18-

111 (1st Cir. 2014) (citing cases emphasizing that the analytical question for us is whether the jury perceived bias). Thus, this first claim respecting the judge's intervention falls flat.

In addition to claiming that the judge unduly assisted the prosecution, Lanza and Galán advance a second argument respecting the judge's actions; they point to instances when the judge allegedly badgered Galán's trial counsel. For example, the judge said "I'm losing my patience with you," and "I want you to pay attention because I don't want you to open the door, and you are quite capable." She further stated that he was "mumbling," "exhausting her," and was a "very hyper person and how should I say, extroverted." These statements, they assert, poisoned the jury against the defendants.

Here, the court's comments, again, were largely prompted by trial counsel's conduct. Counsel regularly attempted to re-litigate matters despite the judge's firm rulings or, at other times, simply lacked traditional courtroom decorum. For instance, he arrived late to court (on more than one occasion), spoke too loudly at counsel table or during bench conferences and, at least once, simply walked out of the courtroom while the judge was speaking. It is understandable that the judge responded as she did. Equally relevant, the bulk of the statements that the defendants point to either occurred at sidebar or were made before the jury even entered the courtroom. Since the jury never heard

most of these statements, and since the comments were justifiable, we find no error.

Even if we were to conclude that the judge's interventions and comments were improper, and that the jury heard all of them, the defendants still cannot succeed. Rather than really engaging on the question of prejudice, they attempt to argue that we should view any error here as structural. In other words, the argument runs, the judicial interventions per se require reversal. The defendants thus posit that we can bypass any evaluation of prejudice.

That position, however, runs head first into our precedent which has consistently required proof of "serious prejudice." We have recently defined that term as requiring "a reasonable probability that, but for the claimed error, the result of the proceeding would have been different." Rivera-Rodríguez, 761 F.3d at 112. We have found such prejudice in the past where the judicial interventions related to an essential piece of evidence, bolstered a key witnesses's testimony, or constituted a decree on an issue more properly reserved for a jury. See, e.g., Rivera-Rodríguez, 761 F.3d at 111-12; Espinal-Almeida, 669 F.3d at 606; United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008).

As noted, the defendants have not offered much that might show serious prejudice. To the extent that they focus on specific interactions, Lanza merely says that "Lanza was convicted on very

scanty proof and acquitted of four offenses. The judge intervened most on witnesses who were testifying as to the conspiracy and the crack cocaine: Serrano and Martínez in particular. Those were the only two substantive charges which Lanza was found guilty." Galán only adds that "Galán's trial counsel was the object of much of the district court's disdain."

Even assuming that this amounts to a developed argument and is thus not waived, see United States v. Oladosu, 744 F.3d 36, 39 (1st Cir. 2014) ("Because the argument is underdeveloped, it is waived."), we discern no critical evidence that was either enhanced or admitted solely on account of the judge's interactions. Further, even if we were to strip away the judicial interventions highlighted in the fact section of the defendants' briefs, there remains enough evidence (when viewing that evidence in a neutral way) to sustain the convictions. Indeed, three co-conspirators, in significant detail, tied Lanza directly to the conspiracy and explained his role as an owner, runner, and enforcer. Two of those three testified specifically to Lanza's ownership of the green-capped crack. For Galán, there was not only significant testimony respecting his interactions with his runner and his drug-ownership, but there was also substantial physical evidence linking him to the conspiracy. Simply put, the parties point us to nothing (nor could we find anything) that would establish the necessary level of prejudice to sustain this claim.

## C.        Jury Charge

Lanza and Galán next point to a number of purported problems with the judge's charge to the jury. Since the defendants did not preserve these objections, we review only for plain error. The defendants must therefore establish that "(1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. LaPlante, 714 F.3d 641, 643 (1st Cir. 2013).

The defendants first take issue with the judge's instruction on conspiracy. After the initial charge, the jury returned with the question "what is conspiracy?" The parties all agreed that the judge would bring the jury back into court and simply re-read the previously provided instruction. At one point, the court intended to say "[m]ere similarity of conduct among various people or the fact they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors." However, the judge skipped over the phrase "interests does not necessarily establish."

Although an error undoubtedly occurred, it can only constitute plain error where the instruction was reasonably likely to have misled the jury. United States v. Troy, 618 F.3d 27, 33 (1st Cir. 2010). We evaluate any such error in the context of the

-22-

entire instruction.  <u>United States</u> v. <u>Brown</u>, 669 F.3d 10, 29 (1st Cir. 2012).

Our recent case of <u>United States</u> v. <u>Pennue</u>, 770 F.3d 985 (1st Cir. 2014), provides guidance.  There, the district court erred in discussing the government's burden of proof by, as here, inadvertently omitting part of the intended instruction.  <u>Pennue</u>, 770 F.3d at 989 (noting that the discussion of reasonable doubt was missing a "negative").  Critically, we found no plain error because: the word could have been inferred from the context of the specific instruction; the broader instructions correctly and repeatedly emphasized the government's burden; and the lack of an objection manifested the relative unimportance of the mistake.

These factors animate the same result here.  First, no impermissible instruction could have been inferred by the jury as a result of the mistake.  That is, the judge skipped the phrase "interests does not necessarily establish" before saying, "but you may consider it such" when discussing what did and what did not constitute a conspiracy.  That limiting phrase ("but you may consider it") only makes sense if the prior proposition is limited in some way; i.e. it would be impossible to reconcile "does necessarily" establish proof of a conspiracy with "but you may consider it such."  In other words, even if the jury were confused by the omission, it would have been impossible for the jury to have

assumed that similarity in interests and conduct <u>did</u> automatically permit a finding of a conspiracy.

Moreover, at the point the judge made this mistake, the court had already properly defined a conspiracy both during the initial charge and again in response to the jury question. The court properly placed the burden on the prosecution to prove "that the agreement specified in the indictment . . . is one, to have one common objective, the illegal possession with the intent to distribute drugs and not some other agreement or agreements existed between two people to possess with intent to distribute heroin and or the crack cocaine and or the cocaine and or the marijuana." Further, the judge stated that the prosecution needed to show "that the defendant willfully joined in that agreement," and that "those that were involved share a general understanding of the crime . . . to act voluntarily and intelligently with the specific intent that the underlying crime be committed." Perhaps most critically, the judge added "on the other hand a person who has no knowledge of a conspiracy but simply happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator." We are satisfied that, as a whole, the instructions conveyed the proper definition of a conspiracy. <u>See</u> <u>United States</u> v. <u>González-Vélez</u>, 466 F.3d 27, 35 (1st Cir. 2006).

We note finally that, just as in <u>Pennue</u>, no one objected to the missing instruction. Although not dispositive on its own,

the fact that three defense attorneys failed to catch the mistake sheds light on its de minimis impact. This error is thus far from significant enough to have affected either the meaning of the instructions or the jury's verdict. No remand is therefore warranted.

Galán next challenges the judge's instruction (or lack thereof) on the intersection of the jury's drug quantity finding and the ultimate sentence imposed. He specifically takes aim at the phrase "I advise you that sentencing, under the law, is an issue that remains within the sole discretion of the Court. If you find any one of the defendants guilty, it will then be my job to decide what punishment should be imposed." He contends that this violated the requirement in Alleyne v. United States that a jury must make certain factual findings when they implicate a mandatory minimum sentence. 133 S.Ct. 2151, 2156 (2013).

No error occurred here. As a factual matter, Galán ignores another part of the jury instructions. There, the judge specifically noted that the jury would have to make findings "under the standard of proof beyond a reasonable doubt," respecting the quantity of the substances involved "which may affect the potential sentence." Compare United States v. Pizarro, 772 F.3d 284 (1st Cir. 2014) (finding error where the court fails to instruct at all on the requirement of the drug quantity finding). If there were

-25-

any doubt, the special verdict form also emphasized that the jury had to make that determination beyond a reasonable doubt.

More pointedly, there was nothing legally incorrect about the cited instruction. We have noted since <u>Alleyne</u> that sentencing remains in the hands of the judge regardless of whether certain facts that implicate a mandatory minimum or statutory maximum go to the jury. <u>See</u> <u>United States</u> v. <u>Breton</u>, 740 F.3d 1, 19 (1st Cir. 2014). Since the judge remains responsible for sentencing after <u>Alleyne</u>, it is perfectly acceptable -- assuming, of course, that the requirements of <u>Alleyne</u> are actually satisfied -- for the court to inform the jury of this uncontroversial proposition.[6]

## D.  Evidentiary Sufficiency and Prejudicial Variance

Unlike Galán and Lanza, who focus on a wealth of different issues, Nieves' appeal principally targets the adequacy of the evidence. In doing so, he asserts a traditional sufficiency of the evidence claim and a prejudicial variance charge. We address each in turn.

We start with the sufficiency claim, which engenders de novo review, viewing the evidence in the light most favorable to the jury's verdict. <u>United States</u> v. <u>Appolon</u>, 695 F.3d 44, 55 (1st

---

[6] We make one passing note respecting the court's special verdict form. That form implied that the jury needed to find the defendants not guilty beyond a reasonable doubt. We have recently admonished the use of this form in <u>United States</u> v. <u>Rodríquez</u>, 735 F.3d 1, 11-14 (1st Cir. 2013). Nonetheless, we concluded in that case that its use did not constitute plain error. We have no reason to rule otherwise in this case.

Cir. 2012). Nieves argues that, at most, the evidence established that he was present at the El Prado housing complex; he protests that it did not show that he was part of the conspiracy. Instead, he contends that all of the evidence tying him to the conspiracy was "minimal, general, and devoid of details." He goes to great lengths to attack the credibility of the co-conspirators and urges us to minimize, if not outright ignore, their testimony. For instance, he says that Pizzaro's testimony was general and internally inconsistent (e.g., he never mentioned Nieves to officers during an initial investigation into the case). Nieves also points to the absence of testimony respecting his intent to join the conspiracy.

Nieves' plea to the contrary, we do not make credibility determinations when assessing the evidence, but instead ask whether sufficient evidence existed to support a conviction. United States v. Rivera-Rodríguez, 617 F.3d 581, 595 n.6 (1st Cir. 2010). Here, we need not dwell -- the testimony of several witnesses connected Nieves directly to Alfalfa's organization, which would have permitted any reasonable jury to find him guilty on count I of the indictment.

For example, Pizarro testified that Nieves owned the "$12 bag" of marijuana and that Alfalfa permitted Nieves to sell it. Pizarro further explained that Nieves was always armed and that he engaged in shootings as part of his protective duties. Pizarro

next discussed how Nieves was related to others in the organization, how he took marijuana from him at a drug point on a specific occasion, and why, as a key enforcer, he was dubbed "sergeant." Pizarro's testimony alone was sufficient to sustain the conviction on this count. See, Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009) ("[A] criminal conviction can rest on the testimony of a single eyewitness. Even if the eyewitness's testimony is uncorroborated and comes from an individual of dubious veracity, it can suffice to ground a conviction.").

Additional testimony and evidence also connected Nieves to the conspiracy. Díaz-Martinez, for example, identified Nieves as the owner of the "$12 bag" of marijuana, and noted that he had tallied money with him. Díaz-Martinez further testified that he witnessed Nieves carrying firearms at Sellés and that Nieves provided protection at drug points. Relatedly, law enforcement officers testified to physical evidence that was tied to Nieves. Such physical evidence included shavings of marijuana, an illegal firearm, two rifles, and three pistols. In sum, this evidence was enough to permit a jury to reasonably infer that Nieves intended to, and then did, join the conspiracy. See, e.g., United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006).

Nieves next asserts that even if he can be tied to the "$12 bag" of marijuana, a conviction on that basis constitutes a prejudicial variance from the charge in the indictment. If

anything, he argues, the evidence tied him to a different drug and different housing unit than those identified in the charging document.

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009). Any variance must be "prejudicial" for reversal to be appropriate. Id. Usually, our inquiry focuses on whether the defendant received adequate notice to permit him or her to defend against the charges. See United States v. Rodríguez, 525 F.3d 85, 102 (1st Cir. 2008).

It is true that the government described each defendant's specific role in the indictment. With respect to Nieves, it classified him as "the owner of a powder cocaine distribution point within the Las Flores and Liborio Pubic Housing Projects and acted as an enforcer and seller within this conspiracy." However, at another place in the indictment, it details the specific charge against Nieves. The charge was: "knowingly and intentionally conspir[ing] . . . to posses with intent to distribute heroin, cocaine, crack cocaine, marijuana, within 1,000 feet of public housing unit."

We have consistently found that where the government charges an individual defendant as part of a broad conspiracy, but alleges his or her involvement in a specific way, it is not a

-29-

material variance for the government to then prove that the defendant was part of the very organization in a distinct manner. For instance, in Rodríquez, the government charged a defendant as part of a broad conspiracy but linked him to a specific individual within the organization and accused him of being a leader in the conspiracy. 525 F.3d at 102-03. Nonetheless, the government proved that the defendant, although he was part of the conspiracy, was actually tied to another individual and had a more circumscribed role. Id. Although the evidence was slightly different, we still determined that no material variance occurred.

In a similar vein, in United States v. Alicea-Cardoza, the government charged the defendant as being part of a conspiracy but described him as a runner, even though at trial it was established that the defendant was a triggerman. 132 F.3d 1, 6 (1st Cir. 1997). We noted that "the error in the indictment was not so grave" since the defendant knew he was on trial for being part of the broader conspiracy. Id. Indeed, "so long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged - so long as the difference does not cause unfair prejudice." Id.

These cases emphasize that our focus is targeted to whether the government has proved the specific elements of the conspiracy alleged in a manner that does not vary from the indictment to an extent that unfairly handicaps or misleads the

defense. <u>United States</u> v. <u>Mubayyid</u>, 658 F.3d 35, 48-54 (1st Cir. 2011). This rule makes sense since the goal of the prejudicial variance analysis is, in part, to determine whether the indictment put the defendant on notice of the charge the government was going to seek to prove at trial. <u>Rodríquez</u>, 525 F.3d at 102 (<u>citing</u> <u>United States</u> v. <u>Balthazard</u>, 360 F.3d 309, 314 (1st Cir. 2004)).

Nieves, like the defendants in the cases discussed, has failed to show how any prejudicial variance occurred. Although the government proved that he was involved in the organization in a slightly different way than originally charged (that is, responsible for a different drug type and centered at a different housing unit), the government nevertheless: (1) alleged and established the existence of the conspiracy; and (2) alleged and proved Nieves' involvement in that very conspiracy. The discrepancy between what was alleged in the indictment and what was established at trial, was not so different that Nieves can now claim that he lacked notice of the crime that the government was seeking to prove. Nor are there any other hints in this record that he was otherwise prejudiced from the minor differences. Accordingly, no material variance exists under these circumstances.

**E.      <u>Alleyne</u> and Conspiracy Drug-Quantity Findings**

The three defendants finally take aim at their sentences. Principally, they disagree with the district court's adoption of certain Guidelines enhancements. We find no errors, and single out

only one point for discussion: Nieves' argument in his Federal Rule of Appellate Procedure 28(j) letter that the district court violated Alleyne in making certain drug-quantity findings. As it is not preserved, we review the claim for plain error.

In establishing Nieves' base-offense level under the Guidelines, U.S.S.G. §2D1.1(c)(1), the district court adopted the jury's findings respecting the amount of drugs that Nieves was responsible for on count one, the broad conspiracy charge. This contributed to setting his base-offense level at 34. Nieves argues that the district court committed an Alleyne error when it made this drug-quantity determination as it subjected him to an "enhanced sentence." He also seems to argue, although just barely, that the court utilized these findings to subject him to a statutory mandatory-minimum.

Nieves' argument that the district court violated Alleyne by finding certain facts for Guidelines purposes is foreclosed by our precedent. As we have noted, "factual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in Alleyne." United States v. Ramírez-Negrón, 751 F.3d 42, 48 (1st Cir. 2014); see also United States v. Correy, 773 F.3d 276, 280 n.4 (1st Cir. 2014). Accordingly, Nieves' contention necessarily fails.

To the extent that Nieves argues that the court improperly subjected him to a statutory mandatory-minimum based on its drug-quantity findings, the record appears to show that the court actually imposed a sentence based purely on Guidelines considerations. As Ramírez-Negrón noted, Alleyne only applies where "the defendant has been convicted and sentenced under the aggravated version of the statute -- that is, where an enhanced mandatory minimum applies." Ramírez-Negrón, 751 F.3d at 49 (emphasis added). Although the district court in this case made a passing reference that the amount of drugs "is the minimum pursuant to the statutory minimum," its actual sentencing decision was based purely on Guidelines considerations and the factors enumerated in 18 U.S.C. § 3553(a). See id. at 50. Indeed, even where the court made the drug quantity findings, it did so exclusively in the context of determining the defendant's base-offense level under the Guidelines. We are thus inclined to say that Alleyne does not even apply in this case.

In any event, we need not conclusively make that determination since, even assuming that Alleyne applies, no error occurred. Our decision in United States v. Acosta-Colón, 741 F.3d 179 (1st Cir. 2013), is instructive. In that case, the jury, like the one in this case, made individualized findings that each defendant conspired to possess and distribute a specific quantity of drugs. The judge then utilized that precise number to determine

the quantity of drugs the defendant was responsible for.  Id. at 192.  We found no error because "the jury's individualized drug-quantity findings still [the defendant's] cry that no individualized findings drove this part of the judge's sentencing decision."  Id.

As in Acosta-Colón, the district court here utilized a special verdict form requiring the jury to make certain drug-quantity findings.  The form asked the jury, with respect to each drug type and each defendant, "Do you unanimously agree, by proof beyond reasonable doubt, that the quantity of substance containing a detectable amount of [drug] which the defendant conspired to posses with the intent to distribute was: [amount]."  Since the jury did just that, the court acted appropriately in attributing that precise amount to Nieves.[7]

## III.

Accordingly, we **affirm** the appellants' convictions and sentences.

---

[7]  Nieves also contends that the amount attributed to him was clearly erroneous.  He is incorrect.  The evidence was more than enough to both situate Nieves as part of the broad conspiracy and to connect him to the specific amount of drugs he could reasonably have foreseen as flowing through the conspiracy.  Indeed, given the length of time that Nieves was involved in the conspiracy (seven years), and his significant role in it, the amount adopted by the jury (1 kilo of heroin, 50g of crack, 5 kilos of cocaine, 100 kilos of marijuana) was on the low end of what a reasonable fact-finder could have attributed to him.