# United States Court of Appeals
## For the First Circuit

No. 21-1023

UNITED STATES OF AMERICA,

Appellee,

v.

DOUGLAS GORDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock Jr., U.S. District Judge]

Before

Lynch and Kayatta, Circuit Judges,
and Woodlock,* District Judge.

Stephen C. Smith for appellant.

Darcie N. McElwee, United States Attorney, with whom Benjamin
M. Block, Assistant U.S. Attorney, was on brief for appellee.

June 23, 2022

_____

* Of the District of Massachusetts, sitting by
designation.

**WOODLOCK, District Judge**.    The appellant, Douglas Gordon, a film buff since childhood, turned his youthful avocation into a criminal vocation when he systematically and deceptively sold counterfeit DVDs of movies without copyright authorization.

A federal jury found Mr. Gordon guilty of two counts for his criminal copyright infringement and one count of mail fraud for his scheme of deceptive marketing.  He was sentenced to thirty-six months of imprisonment on the two copyright counts and sixty months on the mail fraud count, the sentences to be served concurrently as to each count.  Mr. Gordon does not challenge his mail fraud conviction.

On this appeal, he argues nevertheless that 1) the verdict should be vacated because the evidence did not show he willfully committed copyright violations, and/or in the alternative, 2) that his sentence must be adjusted because of alleged errors in the district court's loss calculation.  We find these arguments unavailing and affirm.

### I. BACKGROUND

A.    Facts

From the evidence presented at trial, a reasonable jury could find the following facts.

During the period of criminal activity alleged in the superseding indictment on which he was tried — from about January

21, 2014 to January 2019[1] — Mr. Gordon ran Edge Video, a small chain of video stores, and several websites to sell and rent films, including findrareDVDs.com, lostmoviesfound.com, and lostmoviefinder.com. These websites sold DVDs of movies not widely available for sale by making copies that Mr. Gordon and his employees — or a third-party company, at Mr. Gordon's direction — derived from "master" DVDs, which were in turn copied from VHS tapes.

Customers and copyright holders were unhappy about these commercial activities and made that known to Mr. Gordon. His employees routinely heard complaints — which they forwarded to him— from customers who believed they would receive a legitimate DVD, not a duplicate disc, or found the DVDs did not work or were of low-quality. One employee said she heard "hundreds" of complaints and another said complaints came "[a]lmost daily." The Better Business Bureau forwarded numerous customer complaints to Mr. Gordon. Copyright holders also sent him cease-and-desist emails upon their discovery of the reproductions.

---

[1] The counts in the superseding indictment alleged overlapping time periods of criminal activity. Count 1, the first copyright count, alleged a period "beginning on or about January 21, 2014 and continuing to about June 3, 2014." Count 2, the second copyright count, alleged a period "beginning on or about July 12, 2016 and continuing to about December 30, 2016." Count 3, the mail fraud count, alleged a scheme to defraud "[f]rom about April, 2014 to about January, 2019."

State and federal authorities investigated, beginning their inquiries even before the period of criminal conduct alleged in the superseding indictment. First, the Maine Attorney General's Office on August 10, 2012, sent a demand letter to findrareDVDs.com and Edge Video that asked for documents related to "unfair and deceptive acts and practices . . . and possible copyright violations." Maine's Attorney General referred the case to the federal government thereafter when Mr. Gordon failed to comply with the demand letter.

The ensuing federal investigation uncovered hundreds of orders for DVDs, over two hundred complaints from customers, and multiple cease-and-desist emails. A search of Mr. Gordon's residence on August 4, 2015 turned up DVD duplicators, computers, master discs, copies of discs to be mailed out (with the FBI copyright warning removed from films), and mail addressed to findrareDVDs.com. The federal government sent Mr. Gordon a target letter on the same date as the search, notifying him that he was under investigation for "mail fraud, wire fraud, and criminal infringement of movies protected by copyright."

Despite the complaints, the investigations, and the letters from state and federal authorities, Mr. Gordon was undeterred. An associate testified that Mr. Gordon continued copying movies months after the August 2015 search. The Motion Picture Association, a movie studio trade organization, bought a

-4-

movie from lostmoviesfound.com in December 2016 and received what it described as a counterfeit copy. The Association then sent Mr. Gordon a cease-and-desist letter, noting his actions were illegal under federal law.

Mr. Gordon doubled down by employing an out-of-state vendor to conceal his operations. Starting in March 2017, he had Kunaki, a Nevada company, take over copying and mailing DVDs. He told an associate that, were federal investigators to search his home again, "they [wouldn't] find anything and they [wouldn't] be able to take this away from [him]." Kunaki would later suspend Mr. Gordon's accounts, first in early December 2018 due to a complaint from a purchaser that a disc was "pirated," and then several weeks later after a federal agent contacted the company.

A second search of Mr. Gordon's residence on May 10, 2017, again found a DVD duplicator, computers, DVDs, VHS tapes, order forms, and mail sent to findrareDVDs.com and lostmoviesfound.com. The seized computers showed a user had visited copyright.gov and retrieved copyright certificates. A user had also, between August 2015 and June 2016, searched for information on copyright infringement and defenses.

B. **Charges and Trial**

In the operative charging document, the superseding indictment handed down on April 17, 2019, Mr. Gordon was charged with two counts of criminal copyright infringement, in violation

of 17 U.S.C. § 506(a)(1)(B) and 18 U.S.C. §§ 2319(a), 2319(c)(1) and 2, and one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.[2]  A jury found Mr. Gordon guilty of all three counts.

At trial, Mr. Gordon contended his actions were not willful because he believed that his sales were permitted based on the DVDs' status as orphan works and on the fair use doctrine.  As to orphan works, Mr. Gordon testified that he believed that if the owner of content no longer existed, he was free to reproduce it, since "there would be no damages if there's no copyright holder."  As to fair use, Mr. Gordon testified he believed after considering the matter that his reproductions were permissible.  He testified he would primarily consider whether the movie was ever on DVD — if not, he might sell it, because he assumed any sales could not affect the DVD market.  And he further testified he would consider whether the movie was old enough to "have an educational value to society," which, in his view, would weigh in favor of fair use.

As to the copyright counts, the jury was instructed that they needed to find, among other things, "that Mr. Gordon infringed the copyright willfully."  The jury was told that to act willfully "mean[t] to act voluntarily and intelligently and with the specific

_____

[2]     The copyright counts in the superseding indictment were identical to the copyright counts brought in the original indictment handed down on January 17, 2019.  The original indictment charged only copyright violations.  The mail fraud count was added in the superseding indictment.

intent that the underlying crime be committed, that is to say, with bad purpose, either to disobey or disregard the law, not to act by ignorance, accident, or mistake."[3]  Further, the jury was told that "Mr. Gordon's actions could be willful even if he only knew that the copying may be illegal, but did not know that it was to a certainty."  The jury was told "[t]he willfulness requirement [could] also be satisfied if there [was] a showing that Mr. Gordon deliberately disregarded a high probability that he was infringing copyrights."

In addition to the instruction on willfulness, the jury received instructions on fair use and orphan works.  The district court told the jury that "United States copyright law does not recognize the concept of an orphan work."  For fair use, the jury was told that if it found "the elements of a copyright violation beyond a reasonable doubt," Mr. Gordon needed to show that "his use was more likely fair use than not," based on a preponderance of the evidence.  Mr. Gordon does not challenge any of these instructions.

---

[3]    We note our decision in United States v. Beltran merely assumed without deciding that specific intent is required by the willfulness element of a criminal copyright infringement charge. 503 F.3d 1, 2 (1st Cir. 2007); see also United States v. Liu, 731 F.3d 982, 989-90 (9th Cir. 2013).  This case does not raise any question concerning that issue because there is no challenge to the instructions presented here.

C.     **Sentencing**

The presentence report prepared by the Probation Office performed two loss calculations, one for the copyright counts and one for the mail fraud count based on deceptive marketing. For both calculations, the presentence report relied on the government's records submitted at trial and found a value of $638,659.60 for each calculation. The report noted that in copyright cases it is preferable to rely on the retail value of the infringed items. See U.S.S.G. § 2B5.3 n.2(A)(v). Although the movies at issue in the report were not sold commercially — as a result of which no direct retail price point was available — the report found Mr. Gordon sold DVDs for close to or more than the average price of a DVD for a feature film at the time. Thus, the report found the $638,659.60 figure applicable, as a sum based on Mr. Gordon's proceeds.

The presentence report then grouped the three counts together for purposes of the offense level guideline calculation, because the counts "involve[d] two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," and for the additional reason that "the offense level [was] determined largely on the basis of the total amount of harm or loss." See U.S.S.G. §§ 3D1.2(b) and (d). To calculate the total offense level for the group, the report started by considering what the offense levels would be separately for the

mail fraud count and for the copyright counts. The mail fraud count had a base offense level of seven, U.S.S.G. § 2B1.1(a)(1), and the copyright counts both had a base offense level of eight, U.S.S.G. § 2B5.3(a). The $638,659.60 loss value meant a fourteen-level increase over the base level for all counts, because that loss amount fell in the range between $550,000 and $1,500,000. See U.S.S.G. §§ 2B1.1(b)(1)(H) and 2B5.3(b)(1). Ultimately, the mail fraud count produced the highest total offense level — 31, compared to 30 for the copyright counts — due to other specific offense characteristics[4] not relevant for the copyright counts; consequently, the report found the total offense level for mail fraud applicable. See U.S.S.G. § 3D1.3(a).

At his sentencing hearing, Mr. Gordon made three objections to the loss calculation in the presentence report. First, he argued the sales included in the calculation were too speculative. Second, he contested "whether sales from findrareDVDs.com and lostmoviesfound.com were part of the same course of conduct as the offense of conviction." See U.S.S.G. § 3D1.2(b). Third, he said the calculations of loss incorrectly included some legitimate sales.

---

[4] These additional offense characteristics, only applicable for mail fraud, concerned the victim count, see U.S.S.G. § 2B1.1(b)(2)(A)(i), and Mr. Gordon's decision to relocate the scheme to another jurisdiction to evade detection, see U.S.S.G. § 2B1.1(b)(10)(A).

The district court rejected those arguments and adopted the loss calculations in the presentence report. Relying on a government affidavit mirroring the records presented at trial and used in the presentence report, the district court found the $638,659.60 loss figure supported. Relying upon United States v. Pennue, 770 F.3d 985 (1st Cir. 2014), the district court concluded sales in this figure were all part of the same course of conduct. The district court further found that even if some sales included within the loss calculation figure were "legitimate," there would not be nearly enough proceeds from "legitimate" sales to lower the loss amount below $550,000, the threshold triggering the fourteen-level increase. Accordingly, the district court grounded its guideline calculation on the presentence report loss analysis.

Based on this loss analysis, together with other guideline factors considered, Mr. Gordon's total offense level was determined to be 31 and, because he had no criminal history, the resultant guideline range was 108 to 135 months.[5] See U.S.S.G. ch. 5, pt. A (sentencing table). Mr. Gordon was sentenced to concurrent prison terms of thirty-six months for the copyright counts and sixty months for the mail fraud count.

---

[5] Had sentencing been based exclusively on the copyright counts, Mr. Gordon's offense level would have been 30, one level lower than his offense level for the mail fraud. An offense level of 30, combined with Mr. Gordon's lack of criminal history, would have resulted in a guideline range of 97 to 112 months. See U.S.S.G. ch. 5, pt. A (sentencing table).

D.    **Arguments on Appeal**

Mr. Gordon filed a timely notice of appeal on January 6, 2021. He presses two arguments on appeal, neither of which were presented to the trial court. First, he says there was insufficient evidence for the jury to find that his copyright infringements were willful. Second, he says the district court erred in its guideline loss calculation in two ways. He contends (a) the district court was wrong to account for sales of movies for which the government did not submit copyright certificates, and (b) the district court failed to account for refunds that he gave to dissatisfied customers.

## II. MERITS

A.    **Sufficiency of the Evidence**

Because Mr. Gordon did not present a Rule 29 motion at the close of the government's case nor after his presentation of evidence, and he did not move for judgment of acquittal after the jury's verdict, we review his challenge to the sufficiency of the evidence for clear and gross injustice. See United States v. Hernández-Román, 981 F.3d 138, 143 (1st Cir. 2020). In this connection, "[t]here can be no clear and gross injustice if the evidence, scrutinized in the light most congenial with the verdict, can support a finding of guilt beyond a reasonable doubt." Id.

Mr. Gordon's challenge centers on whether the evidence showed he willfully committed copyright violations. "[W]hen used

-11-

in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" Bryan v. United States, 524 U.S. 184, 191-92 (1998) (footnote omitted). That is, "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" Id. (quoting Ratzlaf v. United States, 510 U.S. 135, 137 (1994)). Guilty knowledge can be inferred based on the defendant's disregard of warning signs "sufficient to put a reasonably prudent person on inquiry notice." United States v. Singh, 222 F.3d 6, 11 (1st Cir. 2000). This standard aligns with the jury instructions given at Mr. Gordon's trial, and Mr. Gordon does not challenge those instructions, only the sufficiency of the evidence as to willfulness.

There is overwhelming evidence that Mr. Gordon could be found not merely to have deliberately closed his eyes to the illegality of his conduct. More fundamentally, the jury could easily have found that he acted with actual knowledge that his conduct was illegal.

As a filmmaker, Mr. Gordon took care to mark his own work for copyright protection. In fact, he described to a colleague how to seek copyright protection, the reasons for doing so, and the risks for filmmakers in using copyrighted work belonging to others. In the course of selling copied DVDs — from which he stripped the FBI copyright warnings used in the originals

— he received complaints from copyright holders. Mr. Gordon persisted in his activities even while knowing he was under investigation by the Maine Attorney General and the federal government. With this record, a rational jury could readily conclude beyond a reasonable doubt that Mr. Gordon acted willfully.

Mr. Gordon says that he considered the potential illegal nature of his actions and that he did his best to obey the law by following his understanding of the concepts of "orphan works" and of fair use. But those arguments wither in the light generated by the many warning signs demonstrating his knowledge that he was breaking the law. We are tasked with construing the facts in the light most favorable to the jury's guilty verdict. With that in mind, even if we could discern some plausibility to Mr. Gordon's arguments, there is more than sufficient evidence for the jury to have found a willful intent.

Mr. Gordon testified at trial about why he believed his actions were legal. The jury understandably did not choose to credit his testimony. Moreover, the jury heard an abundance of evidence summarily recounted here that included a demonstration that Mr. Gordon continued to copy movies after receiving multiple warnings from copyright owners and being under state and federal investigation. It was well within the bounds of reason for the jury, having weighed Mr. Gordon's contentions against the record, to find his actions willful.

**B.    Loss Calculation**

We find it helpful for clarity of analysis to divide the defendant's loss calculation contentions into three categories. Here we conduct review for plain error.[6]  Plain error review requires us to determine "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016) (citation and internal quotation marks omitted).  This is a "heavy burden." United States v. Pérez-Rodríguez, 13 F.4th 1, 16 (1st Cir. 2021). "Appellate review of federal criminal sentences is characterized by a frank recognition of the substantial discretion vested in a sentencing court."  United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

1. Certificates.  Mr. Gordon testified at trial that, for all movies on his websites, he checked copyright.gov and found they were registered for copyright protection.  The district court had no occasion to explore the validity of the copyrights through considerations of certificates at sentencing because Mr. Gordon

---

[6]    The government argues that Mr. Gordon waived his guideline claims.  Given our disposition of the merits of the issues in this case, we need not address the government's waiver argument.

did not raise the certificate issue until appeal.[7]  The district court reasonably relied on Mr. Gordon's testimony to find by a preponderance of the evidence that all movies in the calculation were copyright-protected.  See U.S.S.G. § 6A1.3(a) (allowing for flexibility in evidence considered by sentencing judge).

2. Reasonable Estimation.  More broadly, we also see no error with respect to the submission of certificates because the district court carefully explained why the government's estimates were reasonably reliable and why the sales were all part of the same course of conduct.  The court noted some sales were possibly "legitimate" but that any such sales could not have been enough to reduce the loss calculation from $638,659.60 to below $550,000, the threshold for the fourteen-level increase from the base offense level.  See § 2B1.1 cmt. n. 3(C) ("The [district] court need only make a reasonable estimate of the loss.").  There was nothing unduly speculative in the district court's explanation of loss. We see no error in the district judge's loss calculation, even if based on copyright infringement alone.

---

[7] We note that we held some fifteen years ago that registration evidenced by a certificate is not required to establish a criminal copyright violation. Beltran, 503 F.3d at 2 (holding, in the alternative, that Section 411 of the Copyright Act of 1976, codified at 17 U.S.C. "appears to govern only civil infringement suits").  We are aware of no developments since then that would prompt us to suggest reconsideration of that holding.

3. Refunds.  Mr. Gordon suggests that the loss calculation failed to account for refunds that he sometimes gave to dissatisfied customers.  The guidelines contain a call for leniency where a defendant has returned money received through criminal actions.  See U.S.S.G. § 2B1.1 cmt. n. 3(E)(i).

The comment in the guidelines that Mr. Gordon cites says that a loss calculation "shall be reduced by" the sum of:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (emphasis added).

This comment makes plain that Mr. Gordon's argument goes nowhere.  The loss calculation only included sales from after January 21, 2014, the beginning of the period of the criminal activity specified in the superseding indictment.  Mr. Gordon can only claim the benefit of refunds he gave before the point at which his offenses were detected, a point defined as when either the government or a victim detected the offenses or when a defendant "knew or reasonably should have known the offense[s] were detected" – whichever was earlier.  Id.; United States v. Maisonet-González, 785 F.3d 757, 763 (1st Cir. 2015).

-16-

It was indisputably known to Mr. Gordon that his offenses had been detected by August 2012 — over a year before the time covered by the loss calculation — when the Maine Attorney General's Office sent him a demand letter.  At that point, customers who would qualify as victims had already complained — hence the state investigation — and the Maine Attorney General had reason to believe he was violating the law — hence the notice in the demand letter.  The demand letter put Mr. Gordon himself on notice that the offenses had been detected.  Refunds made after that date are not entitled to leniency.  We see no merit then to Mr. Gordon's contention that the loss calculation failed to account for any relevant refunds.

## III. CONCLUSION

Because we find Mr. Gordon's arguments on appeal unavailing, we <u>affirm</u> the judgment of the district court.